PAUL, CHIEF OF POLICE, LOUISVILLE, ET AL.
*v.* DAVIS

No. 74–891. Argued November 4, 1975—Decided March 23, 1976

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, BLACKMUN, and POWELL, JJ., joined. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, J., joined, and in which WHITE, J., joined in part, *post*, p. 714. STEVENS, J., took no part in the consideration or decision of the case.

*Carson P. Porter* argued the cause for petitioners. With him on the brief was *J. Bruce Miller.*

*Daniel T. Taylor III* argued the cause for respondent. With him on the brief were *Robert Allen Sedler, William H. Allison, Jr., Melvin L. Wulf, John H. F. Shattuck,* and *Leon Friedman.**

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

We granted certiorari, 421 U. S. 909 (1975), in this case to consider whether respondent's charge that petitioners' defamation of him, standing alone and apart from any other governmental action with respect to him, stated a claim for relief under 42 U. S. C. § 1983 and the Fourteenth Amendment. For the reasons hereinafter stated, we conclude that it does not.

Petitioner Paul is the Chief of Police of the Louisville, Ky., Division of Police, while petitioner McDaniel occupies the same position in the Jefferson County, Ky., Division of Police. In late 1972 they agreed to combine their efforts for the purpose of alerting local area merchants to possible shoplifters who might be operating dur-

---

**Frank G. Carrington, Fred E. Inbau, William K. Lambie,* and *Wayne W. Schmidt* filed a brief for Americans for Effective Law Enforcement, Inc., et al. as *amici curiae* urging reversal.

ing the Christmas season. In early December petitioners distributed to approximately 800 merchants in the Louisville metropolitan area a "flyer," which began as follows:

"TO: BUSINESS MEN IN THE METROPOLITAN AREA

"The Chiefs of The Jefferson County and City of Louisville Police Departments, in an effort to keep their officers advised on shoplifting activity, have approved the attached alphabetically arranged flyer of subjects known to be active in this criminal field.

"This flyer is being distributed to you, the business man, so that you may inform your security personnel to watch for these subjects. These persons have been arrested during 1971 and 1972 or have been active in various criminal fields in high density shopping areas.

"Only the photograph and name of the subject is shown on this flyer, if additional information is desired, please forward a request in writing . . . ."

The flyer consisted of five pages of "mug shot" photos, arranged alphabetically. Each page was headed:

"NOVEMBER 1972
CITY OF LOUISVILLE
JEFFERSON COUNTY
POLICE DEPARTMENTS
ACTIVE SHOPLIFTERS"

In approximately the center of page 2 there appeared photos and the name of the respondent, Edward Charles Davis III.

Respondent appeared on the flyer because on June 14, 1971, he had been arrested in Louisville on a charge of shoplifting. He had been arraigned on this charge in September 1971, and, upon his plea of not guilty, the

charge had been "filed away with leave [to reinstate]," a disposition which left the charge outstanding. Thus, at the time petitioners caused the flyer to be prepared and circulated respondent had been charged with shoplifting but his guilt or innocence of that offense had never been resolved. Shortly after circulation of the flyer the charge against respondent was finally dismissed by a judge of the Louisville Police Court.

At the time the flyer was circulated respondent was employed as a photographer by the Louisville Courier-Journal and Times. The flyer, and respondent's inclusion therein, soon came to the attention of respondent's supervisor, the executive director of photography for the two newspapers. This individual called respondent in to hear his version of the events leading to his appearing in the flyer. Following this discussion, the supervisor informed respondent that although he would not be fired, he "had best not find himself in a similar situation" in the future.

Respondent thereupon brought this § 1983 action in the District Court for the Western District of Kentucky, seeking redress for the alleged violation of rights guaranteed to him by the Constitution of the United States. Claiming jurisdiction under 28 U. S. C. § 1343 (3), respondent sought damages as well as declaratory and injunctive relief. Petitioners moved to dismiss this complaint. The District Court granted this motion, ruling that "[t]he facts alleged in this case do not establish that plaintiff has been deprived of any right secured to him by the Constitution of the United States."

Respondent appealed to the Court of Appeals for the Sixth Circuit which recognized that, under our decisions, for respondent to establish a claim cognizable under § 1983 he had to show that petitioners had deprived

him of a right secured by the Constitution [1] of the United States, and that any such deprivation was achieved under color of law.[2] *Adickes* v. *Kress & Co.*, 398 U. S. 144, 150 (1970). The Court of Appeals concluded that respondent had set forth a § 1983 claim "in that he has alleged facts that constitute a denial of due process of law." 505 F. 2d 1180, 1182 (1974). In its view our decision in *Wisconsin* v. *Constantineau*, 400 U. S. 433 (1971), mandated reversal of the District Court.

## I

Respondent's due process claim is grounded upon his assertion that the flyer, and in particular the phrase "Active Shoplifters" appearing at the head of the page upon which his name and photograph appear, impermissibly deprived him of some "liberty" protected by the Fourteenth Amendment. His complaint asserted that the "active shoplifter" designation would inhibit him from entering business establishments for fear of being suspected of shoplifting and possibly apprehended, and would seriously impair his future employment opportunities. Accepting that such consequences may flow from the flyer in question, respondent's complaint would appear to state a classical claim for defamation actionable in the courts of virtually every State. Imputing criminal behavior to an individual is generally considered defamatory *per se,* and actionable without proof of special damages.

Respondent brought his action, however, not in the state courts of Kentucky, but in a United States District

---

[1] The "and laws" provision of 42 U. S. C. § 1983 is not implicated in this case.

[2] It is not disputed that petitioners' actions were a part of their official conduct and that this element of a § 1983 cause of action is satisfied here.

Court for that State. He asserted not a claim for defamation under the laws of Kentucky, but a claim that he had been deprived of rights secured to him by the Fourteenth Amendment of the United States Constitution. Concededly if the same allegations had been made about respondent by a private individual, he would have nothing more than a claim for defamation under state law. But, he contends, since petitioners are respectively an official of city and of county government, his action is thereby transmuted into one for deprivation by the State of rights secured under the Fourteenth Amendment.

In *Greenwood v. Peacock*, 384 U. S. 808 (1966), in the course of considering an important and not wholly dissimilar question of the relationship between the National and the State Governments, the Court said that "[i]t is worth contemplating what the result would be if the strained interpretation of § 1443 (1) urged by the individual petitioners were to prevail." *Id.*, at 832. We, too, pause to consider the result should respondent's interpretation of § 1983 and of the Fourteenth Amendment be accepted.

If respondent's view is to prevail, a person arrested by law enforcement officers who announce that they believe such person to be responsible for a particular crime in order to calm the fears of an aroused populace, presumably obtains a claim against such officers under § 1983. And since it is surely far more clear from the language of the Fourteenth Amendment that "life" is protected against state deprivation than it is that reputation is protected against state injury, it would be difficult to see why the survivors of an innocent bystander mistakenly shot by a policeman or negligently killed by a sheriff driving a government vehicle, would not have claims equally cognizable under § 1983.

It is hard to perceive any logical stopping place to such

a line of reasoning. Respondent's construction would seem almost necessarily to result in every legally cognizable injury which may have been inflicted by a state official acting under "color of law" establishing a violation of the Fourteenth Amendment. We think it would come as a great surprise to those who drafted and shepherded the adoption of that Amendment to learn that it worked such a result, and a study of our decisions convinces us they do not support the construction urged by respondent.

## II

The result reached by the Court of Appeals, which respondent seeks to sustain here, must be bottomed on one of two premises. The first is that the Due Process Clause of the Fourteenth Amendment and § 1983 make actionable many wrongs inflicted by government employees which had heretofore been thought to give rise only to state-law tort claims. The second premise is that the infliction by state officials of a "stigma" to one's reputation is somehow different in kind from the infliction by the same official of harm or injury to other interests protected by state law, so that an injury to reputation is actionable under § 1983 and the Fourteenth Amendment even if other such harms are not. We examine each of these premises in turn.

## A

The first premise would be contrary to pronouncements in our cases on more than one occasion with respect to the scope of § 1983 and of the Fourteenth Amendment. In the leading case of *Screws* v. *United States,* 325 U. S. 91 (1945), the Court considered the proper application of the criminal counterpart of § 1983, likewise intended by Congress to enforce the guarantees of the Fourteenth

Amendment. In his opinion for the Court plurality in that case, Mr. Justice Douglas observed:

"Violation of local law does not necessarily mean that federal rights have been invaded. The fact that a prisoner is assaulted, injured, or even murdered by state officials does not necessarily mean that he is deprived of any right protected or secured by the Constitution or laws of the United States." 325 U. S., at 108–109.

After recognizing that Congress' power to make criminal the conduct of state officials under the aegis of the Fourteenth Amendment was not unlimited because that Amendment "did not alter the basic relations between the States and the national government," the plurality opinion observed that Congress should not be understood to have attempted

"to make all torts of state officials federal crimes. It brought within [the criminal provision] only specified acts done 'under color' of law and then only those acts which deprived a person of some right secured by the Constitution or laws of the United States." *Id.*, at 109.

This understanding of the limited effect of the Fourteenth Amendment was not lost in the Court's decision in *Monroe* v. *Pape,* 365 U. S. 167 (1961). There the Court was careful to point out that the complaint stated a cause of action under the Fourteenth Amendment because it alleged an unreasonable search and seizure violative of the guarantee "contained in the Fourth Amendment [and] made applicable to the States by reason of the Due Process Clause of the Fourteenth Amendment." *Id.*, at 171. Respondent, however, has pointed to no specific constitutional guarantee safeguarding the interest he asserts has been invaded.

Rather, he apparently believes that the Fourteenth Amendment's Due Process Clause should *ex proprio vigore* extend to him a right to be free of injury wherever the State may be characterized as the tortfeasor. But such a reading would make of the Fourteenth Amendment a font of tort law to be superimposed upon whatever systems may already be administered by the States. We have noted the "constitutional shoals" that confront any attempt to derive from congressional civil rights statutes a body of general federal tort law, *Griffin* v. *Breckenridge,* 403 U. S. 88, 101–102 (1971); *a fortiori,* the procedural guarantees of the Due Process Clause cannot be the source for such law.

## B

The second premise upon which the result reached by the Court of Appeals could be rested—that the infliction by state officials of a "stigma" to one's reputation is somehow different in kind from infliction by a state official of harm to other interests protected by state law—is eqᵘally untenable. The words "liberty" and "property" as used in the Fourteenth Amendment do not in terms single out reputation as a candidate for special protection over and above other interests that may be protected by state law. While we have in a number of our prior cases pointed out the frequently drastic effect of the "stigma" which may result from defamation by the government in a variety of contexts, this line of cases does not establish the proposition that reputation alone, apart from some more tangible interests such as employment, is either "liberty" or "property" by itself sufficient to invoke the procedural protection of the Due Process Clause. As we have said, the Court of Appeals, in reaching a contrary conclusion, relied primarily upon *Wisconsin* v. *Constantineau,* 400 U. S. 433 (1971). We think the correct import of that

decision, however, must be derived from an examination of the precedents upon which it relied, as well as consideration of the other decisions by this Court, before and after *Constantineau,* which bear upon the relationship between governmental defamation and the guarantees of the Constitution. While not uniform in their treatment of the subject, we think that the weight of our decisions establishes no constitutional doctrine converting every defamation by a public official into a deprivation of liberty within the meaning of the Due Process Clause of the Fifth [3] or Fourteenth Amendment.

In *United States* v. *Lovett,* 328 U. S. 303 (1946), the Court held that an Act of Congress which specifically forbade payment of any salary or compensation to three named Government agency employees was an unconstitutional bill of attainder. The three employees had been proscribed because a House of Representatives subcommittee found them guilty of "subversive activity," and therefore unfit for Government service. The Court, while recognizing that the underlying charges upon which Congress' action was premised "stigmatized [the employees'] reputation and seriously impaired their chance to earn a living," *id.,* at 314, also made it clear that "[w]hat is involved here is a congressional proscription of [these employees], prohibiting their ever holding a government job." *Ibid.*

Subsequently, in *Joint Anti-Fascist Refugee Comm.*

---

[3] If respondent is correct in his contention that defamation by a state official is actionable under the Fourteenth Amendment, it would of course follow that defamation by a federal official should likewise be actionable under the cognate Due Process Clause of the Fifth Amendment. Surely the Fourteenth Amendment imposes no more stringent requirements upon state officials than does the Fifth upon their federal counterparts. We thus consider this Court's decisions interpreting either Clause as relevant to our examination of respondent's claim.

v. *McGrath,* 341 U. S. 123 (1951), the Court examined the validity of the Attorney General's designation of certain organizations as "Communist" on a list which he furnished to the Civil Service Commission. There was no majority opinion in the case; Mr. Justice Burton, who announced the judgment of the Court, wrote an opinion which did not reach the petitioners' constitutional claim. Mr. Justice Frankfurter, who agreed with Mr. Justice Burton that the petitioners had stated a claim upon which relief could be granted, noted that "publicly designating an organization as within the proscribed categories of the Loyalty Order does not directly deprive anyone of liberty or property." *Id.,* at 164. Mr. Justice Douglas, who likewise concluded that petitioners had stated a claim, observed in his separate opinion:

> "This is not an instance of name calling by public officials. This is a determination of status—a proceeding to ascertain whether the organization is or is not 'subversive.' This determination has consequences that are serious to the condemned organizations. Those consequences flow in part, of course, from public opinion. But they also flow from actions of regulatory agencies that are moving in the wake of the Attorney General's determination to penalize or police these organizations." *Id.,* at 175.

Mr. Justice Jackson, who likewise agreed that petitioners had stated a claim, commented:

> "I agree that mere designation as subversive deprives the organizations themselves of no legal right or immunity. By it they are not dissolved, subjected to any legal prosecution, punished, penalized, or prohibited from carrying on any of their activities. Their claim of injury is that they cannot attract audiences, enlist members, or obtain contributions

as readily as before. These, however, are sanctions applied by public disapproval, not by law." *Id.*, at 183–184.

He went on to say:

"[T]he real target of all this procedure is the government employee who is a member of, or sympathetic to, one or more accused organizations. He not only may be discharged, but disqualified from employment, upon no other ground than such membership or sympathetic affiliation. . . . To be deprived not only of present government employment but of future opportunity for it certainly is no small injury when government employment so dominates the field of opportunity." *Id.*, at 184–185.

Mr. Justice Reed, writing for himself, The Chief Justice, and Mr. Justice Minton, would have held that petitioners failed to state a claim for relief. In his dissenting opinion, after having stated petitioners' claim that their listing resulted in a deprivation of liberty or property contrary to the procedure required by the Fifth Amendment, he said:

"The contention can be answered summarily by saying that there is no deprivation of any property or liberty of any listed organization by the Attorney General's designation. It may be assumed that the listing is hurtful to their prestige, reputation and earning power. It may be such an injury as would entitle organizations to damages in a tort action against persons not protected by privilege. . . . This designation, however, does not prohibit any business of the organizations, subject them to any punishment or deprive them of liberty of speech or other freedom." *Id.*, at 202.

Thus at least six of the eight Justices who participated

in that case viewed any "stigma" imposed by official action of the Attorney General of the United States, divorced from its effect on the legal status of an organization or a person, such as loss of tax exemption or loss of government employment, as an insufficient basis for invoking the Due Process Clause of the Fifth Amendment.

In *Wieman* v. *Updegraff*, 344 U. S. 183 (1952), the Court again recognized the potential "badge of infamy" which might arise from being branded disloyal by the government. *Id.*, at 191. But it did not hold this sufficient by itself to invoke the procedural due process guarantees of the Fourteenth Amendment; indeed, the Court expressly refused to pass upon the procedural due process claims of petitioners in that case. *Id.*, at 192. The Court noted that petitioners would, as a result of their failure to execute the state loyalty oath, lose their teaching positions at a state university. It held such state action to be arbitrary because of its failure to distinguish between innocent and knowing membership in the associations named in the list prepared by the Attorney General of the United States. *Id.*, at 191. See also *Peters* v. *Hobby*, 349 U. S. 331, 347 (1955).

A decade after *Joint Anti-Fascist Refugee Comm.* v. *McGrath, supra,* the Court returned to consider further the requirements of procedural due process in this area in the case of *Cafeteria Workers* v. *McElroy,* 367 U. S. 886 (1961). Holding that the discharge of an employee of a Government contractor in the circumstances there presented comported with the due process required by the Fifth Amendment, the Court observed:

> "Finally, it is to be noted that this is not a case where government action has operated to bestow a badge of disloyalty or infamy, *with an attendant foreclosure from other employment opportunity.* See

*Wieman* v. *Updegraff*, 344 U. S. 183, 190–191; *Joint Anti-Fascist Comm.* v. *McGrath*, 341 U. S. 123, 140–141 . . . ." *Id.*, at 898. (Emphasis supplied.)

Two things appear from the line of cases beginning with *Lovett*. The Court has recognized the serious damage that could be inflicted by branding a government employee as "disloyal," and thereby stigmatizing his good name. But the Court has never held that the mere defamation of an individual, whether by branding him disloyal or otherwise, was sufficient to invoke the guarantees of procedural due process absent an accompanying loss of government employment.[4]

---

[4] We cannot agree with the suggestion of our Brother BRENNAN, dissenting, *post,* at 727, that the actions of these two petitioner law enforcement officers come within the language used by Mr. Justice Harlan in his dissenting opinion in *Jenkins* v. *McKeithen,* 395 U. S. 411, 433 (1969). They are not by any conceivable stretch of the imagination, either separately or together, "an agency whose sole or predominant function, without serving any other public interest, is to expose and publicize the names of persons it finds guilty of wrongdoing." *Id.,* at 438. Indeed, the actions taken by these petitioners in this case fall far short of the more formalized proceedings of the Commission on Civil Rights established by Congress in 1957, the procedures of which were upheld against constitutional challenge by this Court in *Hannah* v. *Larche,* 363 U. S. 420 (1960). There the Court described the functions of the Commission in this language:

"It does not adjudicate. It does not hold trials or determine anyone's civil or criminal liability. It does not issue orders. Nor does it indict, punish, or impose any *legal sanctions.* It does not make determinations depriving anyone of his life, liberty, or property. In short, the Commission does not and cannot take any affirmative action which will affect an individual's *legal rights.* The only purpose of its existence is to find facts which may subsequently be used as the basis for legislative or executive action." *Id.,* at 441 (emphasis supplied).

Addressing itself to the question of whether the Commission's

It is noteworthy that in *Barr* v. *Matteo,* 360 U. S. 564 (1959), and *Howard* v. *Lyons,* 360 U. S. 593 (1959), this Court had before it two actions for defamation brought against federal officers. But in neither opinion is there any intimation that any of the parties to those cases, or any of the Members of this Court, had the remotest idea that the Due Process Clause of the Fifth Amendment might itself form the basis for a claim for defamation against federal officials.

It was against this backdrop that the Court in 1971 decided *Constantineau.* There the Court held that a Wisconsin statute authorizing the practice of "posting" was unconstitutional because it failed to provide procedural safeguards of notice and an opportunity to be heard, prior to an individual's being "posted." Under the statute "posting" consisted of forbidding in writing the sale or delivery of alcoholic beverages to certain persons who were determined to have become hazards to themselves, to their family, or to the community by reason of their "excessive drinking." The statute also made it a misdemeanor to sell or give liquor to any person so posted. See 400 U. S., at 434 n. 2.

There is undoubtedly language in *Constantineau,* which is sufficiently ambiguous to justify the reliance upon it by the Court of Appeals:

"Yet certainly where the state attaches 'a badge of infamy' to the citizen, due process comes into play.

"proceedings might irreparably harm those being investigated by subjecting them to public opprobrium and scorn, the distinct likelihood of losing their jobs, and the possibility of criminal prosecuitons," the Court said that "even if such collateral consequences were to flow from the Commission's investigations, they would not be the result of any affirmative determinations made by the Commission, and they would not affect the legitimacy of the Commission's investigative function." *Id.,* at 443.

*Wieman* v. *Updegraff,* 344 U. S. 183, 191. '[T]he right to be heard before being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction, is a principle basic to our society.' *Anti-Fascist Committee* v. *McGrath,* 341 U. S. 123, 168 (Frankfurter, J., concurring).

"Where a person's good name, reputation, honor, or integrity is at stake *because of what the government is doing to him,* notice and an opportunity to be heard are essential." *Id.,* at 437 (emphasis supplied).

The last paragraph of the quotation could be taken to mean that if a government official defames a person, without more, the procedural requirements of the Due Process Clause of the Fourteenth Amendment are brought into play. If read that way, it would represent a significant broadening of the holdings of *Wieman* v. *Updegraff,* 344 U. S. 183 (1952), and *Joint Anti-Fascist Refugee Comm.* v. *McGrath,* 341 U. S. 123 (1951), relied upon by the *Constantineau* Court in its analysis in the immediately preceding paragraph. We should not read this language as significantly broadening those holdings without in any way adverting to the fact if there is any other possible interpretation of *Constantineau's* language. We believe there is.

We think that the italicized language in the last sentence quoted, "because of what the government is doing to him," referred to the fact that the governmental action taken in that case deprived the individual of a right previously held under state law—the right to purchase or obtain liquor in common with the rest of the citizenry. "Posting," therefore, significantly altered her status as a matter of state law, and it was that alteration of legal status which, combined with the injury resulting

from the defamation, justified the invocation of procedural safeguards. The "stigma" resulting from the defamatory character of the posting was doubtless an important factor in evaluating the extent of harm worked by that act, but we do not think that such defamation, standing alone, deprived Constantineau of any "liberty" protected by the procedural guarantees of the Fourteenth Amendment.

This conclusion is reinforced by our discussion of the subject a little over a year later in *Board of Regents* v. *Roth,* 408 U. S. 564 (1972). There we noted that "the range of interests protected by procedural due process is not infinite," *id.,* at 570, and that with respect to property interests they are

> "of course, . . . not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.,* at 577.

While *Roth* recognized that governmental action defaming an individual in the course of declining to rehire him could entitle the person to notice and an opportunity to be heard as to the defamation, its language is quite inconsistent with any notion that a defamation perpetrated by a government official but unconnected with any refusal to rehire would be actionable under the Fourteenth Amendment:

> "The state, *in declining to rehire the respondent,* did not make any charge against him that might seriously damage his standing and associations in his community. . . .
>
> "Similarly, there is no suggestion that the State, *in declining to re-employ the respondent,* imposed on

him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities." *Id.*, at 573 (emphasis supplied).

Thus it was not thought sufficient to establish a claim under § 1983 and the Fourteenth Amendment that there simply be defamation by a state official; the defamation had to occur in the course of the termination of employment. Certainly there is no suggestion in *Roth* to indicate that a hearing would be required each time the State in its capacity as employer might be considered responsible for a statement defaming an employee who continues to be an employee.

This conclusion is quite consistent with our most recent holding in this area, *Goss* v. *Lopez*, 419 U. S. 565 (1975), that suspension from school based upon charges of misconduct could trigger the procedural guarantees of the Fourteenth Amendment. While the Court noted that charges of misconduct could seriously damage the student's reputation, *id.*, at 574–575, it also took care to point out that Ohio law conferred a right upon all children to attend school, and that the act of the school officials suspending the student there involved resulted in a denial or deprivation of that right.

## III

It is apparent from our decisions that there exists a variety of interests which are difficult of definition but are nevertheless comprehended within the meaning of either "liberty" or "property" as meant in the Due Process Clause. These interests attain this constitutional status by virtue of the fact that they have been initially recognized and protected by state law,[5] and we

---

[5] There are other interests, of course, protected not by virtue of their recognition by the law of a particular State but because they are guaranteed in one of the provisions of the Bill of Rights which

have repeatedly ruled that the procedural guarantees of the Fourteenth Amendment apply whenever the State seeks to remove or significantly alter that protected status. In *Bell* v. *Burson,* 402 U. S. 535 (1971), for example, the State by issuing drivers' licenses recognized in its citizens a right to operate a vehicle on the highways of the State. The Court held that the State could not withdraw this right without giving petitioner due process. In *Morrissey* v. *Brewer,* 408 U. S. 471 (1972), the State afforded parolees the right to remain at liberty as long as the conditions of their parole were not violated. Before the State could alter the status of a parolee because of alleged violations of these conditions, we held that the Fourteenth Amendment's guarantee of due process of law required certain procedural safeguards.

In each of these cases, as a result of the state action complained of, a right or status previously recognized by state law was distinctly altered or extinguished. It was this alteration, officially removing the interest from the recognition and protection previously afforded by the State, which we found sufficient to invoke the procedural guarantees contained in the Due Process Clause of the Fourteenth Amendment. But the interest in reputation alone which respondent seeks to vindicate in this action in federal court is quite different from the "liberty" or "property" recognized in those decisions. Kentucky law does not extend to respondent any legal guarantee of present enjoyment of reputation which has been altered as a

---

has been "incorporated" into the Fourteenth Amendment. Section 1983 makes a deprivation of such rights actionable independently of state law. See *Monroe* v. *Pape,* 365 U. S. 167 (1961).

Our discussion in Part III is limited to consideration of the procedural guarantees of the Due Process Clause and is not intended to describe those substantive limitations upon state action which may be encompassed within the concept of "liberty" expressed in the Fourteenth Amendment. Cf. Part IV, *infra.*

result of petitioners' actions. Rather his interest in reputation is simply one of a number which the State may protect against injury by virtue of its tort law, providing a forum for vindication of those interests by means of damages actions. And any harm or injury to that interest, even where as here inflicted by an officer of the State, does not result in a deprivation of any "liberty" or "property" recognized by state or federal law, nor has it worked any change of respondent's status as theretofore recognized under the State's laws. For these reasons we hold that the interest in reputation asserted in this case is neither "liberty" nor "property" guaranteed against state deprivation without due process of law.

Respondent in this case cannot assert denial of any right vouchsafed to him by the State and thereby protected under the Fourteenth Amendment. That being the case, petitioners' defamatory publications, however seriously they may have harmed respondent's reputation, did not deprive him of any "liberty" or "property" interests protected by the Due Process Clause.

## IV

Respondent's complaint also alleged a violation of a "right to privacy guaranteed by the First, Fourth, Fifth, Ninth, and Fourteenth Amendments." The Court of Appeals did not pass upon this claim since it found the allegations of a due process violation sufficient to require reversal of the District Court's order. As we have agreed with the District Court on the due process issue, we find it necessary to pass upon respondent's other theory in order to determine whether there is any support for the litigation he seeks to pursue.

While there is no "right of privacy" found in any specific guarantee of the Constitution, the Court has recognized that "zones of privacy" may be created by

more specific constitutional guarantees and thereby impose limits upon government power. See *Roe* v. *Wade,* 410 U. S. 113, 152–153 (1973). Respondent's case, however, comes within none of these areas. He does not seek to suppress evidence seized in the course of an unreasonable search. See *Katz* v. *United States,* 389 U. S. 347, 351 (1967); *Terry* v. *Ohio,* 392 U. S. 1, 8–9 (1968). And our other "right of privacy" cases, while defying categorical description, deal generally with substantive aspects of the Fourteenth Amendment. In *Roe* the Court pointed out that the personal rights found in this guarantee of personal privacy must be limited to those which are "fundamental" or "implicit in the concept of ordered liberty" as described in *Palko* v. *Connecticut,* 302 U. S. 319, 325 (1937). The activities detailed as being within this definition were ones very different from that for which respondent claims constitutional protection—matters relating to marriage, procreation, contraception, family relationships, and child rearing and education. In these areas it has been held that there are limitations on the States' power to substantively regulate conduct.

Respondent's claim is far afield from this line of decisions. He claims constitutional protection against the disclosure of the fact of his arrest on a shoplifting charge. His claim is based, not upon any challenge to the State's ability to restrict his freedom of action in a sphere contended to be "private," but instead on a claim that the State may not publicize a record of an official act such as an arrest. None of our substantive privacy decisions hold this or anything like this, and we decline to enlarge them in this manner.

None of respondent's theories of recovery were based upon rights secured to him by the Fourteenth Amend-

ment. Petitioners therefore were not liable to him under § 1983. The judgment of the Court of Appeals holding otherwise is

Reversed.

MR. JUSTICE STEVENS took no part in the consideration or decision of this case.

MR. JUSTICE BRENNAN, with whom MR. JUSTICE MARSHALL concurs and MR. JUSTICE WHITE concurs in part, dissenting.

I dissent. The Court today holds that police officials, acting in their official capacities as law enforcers, may on their own initiative and without trial constitutionally condemn innocent individuals as criminals and thereby brand them with one of the most stigmatizing and debilitating labels in our society. If there are no constitutional restraints on such oppressive behavior, the safeguards constitutionally accorded an accused in a criminal trial are rendered a sham, and no individual can feel secure that he will not be arbitrarily singled out for similar *ex parte* punishment by those primarily charged with fair enforcement of the law. The Court accomplishes this result by excluding a person's interest in his good name and reputation from all constitutional protection, regardless of the character of or necessity for the government's actions. The result, which is demonstrably inconsistent with our prior case law and unduly restrictive in its construction of our precious Bill of Rights, is one in which I cannot concur.

To clarify what is at issue in this case, it is first necessary to dispel some misconceptions apparent in the Court's opinion. Title 42 U. S. C. § 1983 provides:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within

the jurisdiction thereof to the deprivation of any
rights, privileges, or immunities secured by the Con-
stitution and laws, shall be liable to the party in-
jured in an action at law, suit in equity, or other
proper proceeding for redress."

Thus, as the Court indicates, *ante,* at 696–697, respond-
ent's complaint, to be cognizable under § 1983, must al-
lege both a deprivation of a constitutional right [1] and the
effectuation of that deprivation under color of law.
See, *e. g., Adickes* v. *Kress & Co.,* 398 U. S. 144, 150
(1970). But the implication, see *ante,* at 697–699, that
the existence *vel non* of a state remedy—for example, a
cause of action for defamation—is relevant to the deter-
mination whether there is a cause of action under § 1983,
is wholly unfounded. "It is no answer that the State
has a law which if enforced would give relief. The
federal remedy is supplementary to the state remedy,
and the latter need not be first sought and refused before
the federal one is invoked." *Monroe* v. *Pape,* 365 U. S.
167, 183 (1961). See also, *e. g., McNeese* v. *Board of
Education,* 373 U. S. 668, 671–672 (1963). Indeed, even
if the Court were creating a novel doctrine that state law
is in any way relevant, it would be incumbent upon the
Court to inquire whether respondent has an adequate
remedy under Kentucky law or whether petitioners
would be immunized by state doctrines of official or
sovereign immunity. The Court, however, undertakes
no such inquiry.

Equally irrelevant is the Court's statement that "[c]on-
cededly if the same allegations had been made about
respondent by a private individual, he would have noth-
ing more than a claim for defamation under state law."
*Ante,* at 698. The action complained of here is "state

---

[1] Deprivations of rights secured by "laws" as well as by the
Constitution are actionable under § 1983. Only an alleged consti-
tutional violation is involved in this case. *Ante,* at 697 n. 1.

action" allegedly in violation of the Fourteenth Amendment, and that Amendment, which is *only* designed to prohibit "state" action, clearly renders unconstitutional actions taken by state officials that would merely be criminal or tortious if engaged in by those acting in their private capacities. Of course, if a private citizen enters the home of another, manacles and threatens the owner, and searches the house in the course of a robbery, he would be criminally and civilly liable under state law, but no constitutional rights of the owner would be implicated. However, if state police officials engage in the same acts in the course of a narcotics investigation, the owner may maintain a damages action against the police under § 1983 for deprivation of constitutional rights "under color of" state law. Cf. *Bivens* v. *Six Unknown Federal Narcotics Agents,* 403 U. S. 388, 390–392 (1971). See also, *e. g., Monroe* v. *Pape, supra.* In short, it is difficult to believe that the Court seriously suggests, see *ante,* at 697–698, that there is some anomaly in the distinction, for constitutional purposes, between tortious conduct committed by a private citizen and the same conduct committed by state officials under color of state law.

It may be that I misunderstand the thrust of Part I of the Court's opinion. Perhaps the Court is not questioning the involvement of a constitutional "liberty" or "property" interest in this case, but rather whether the deprivation of those interests was accomplished "under color of" state law. The Court's expressed concern that but for today's decision, negligent tortious behavior by state officials might constitute a § 1983 violation, see *ante,* at 698, suggests this reading.[2] But that concern is

---

[2] Indeed, it would be difficult to interpret that discussion as anything but a discussion of the "under color of" law requirement of § 1983, which is not involved in this case and which has no relationship to the question whether a "liberty" or "property" interest is

groundless. An official's actions are not "under color of" law merely because he is an official; an off-duty police-man's discipline of his own children, for example, would not constitute conduct "under color of" law. The essential element of this type of § 1983 action [3] is *abuse* of his *official position.* "Congress, in enacting [§ 1983], meant to give a remedy to parties deprived of constitutional rights, privileges and immunities by an official's *abuse of his position." Monroe* v. *Pape, supra,* at 172 (emphasis supplied). Section 1983 focuses on "[m]isuse of power, possessed by virtue of state law and *made possible only because the wrongdoer is clothed with the authority of state law." United States* v. *Classic,* 313 U. S. 299, 326 (1941) (emphasis supplied). Moreover, whether or not mere negligent official conduct in the course of duty can ever constitute such abuse of power, the police officials here concede that their conduct was intentional and was undertaken in their official capacities. Therefore, beyond peradventure, it is action taken under color of law, see *ante,* at 697, and n. 2, and it is disingenuous for the Court to argue, see *ante,* at 700–701, that respondent is seeking to convert § 1983 into a generalized font of tort law. The only issue properly presented by this case is whether petitioners' intentional conduct infringed any of respondent's "liberty" or "property" interests without due process of law, and that is the question to be addressed. I am

_____

involved here. There is simply no way in which the Court, despite today's treatment of the terms "liberty" and "property," could declare that the loss of a person's life is not an interest cognizable within the "life" portion of the Due Process Clause. See *ante,* at 698–699.

[3] Of course, in addition to providing a remedy when an official abuses his position, § 1983 is designed to provide a remedy when a state statute itself abridges constitutional rights, when a remedy under state law is inadequate to protect constitutional rights, and when a state remedy, though adequate in theory, is unavailable in practice. See, *e. g., Monroe* v. *Pape,* 365 U. S. 167, 173–174 (1961).

persuaded that respondent has alleged a case of such infringement, and therefore of a violation of § 1983.

The stark fact is that the police here have officially imposed on respondent the stigmatizing label "criminal" without the salutary and constitutionally mandated safeguards of a criminal trial. The Court concedes that this action will have deleterious consequences for respondent. For 15 years, the police had prepared and circulated similar lists, not with respect to shoplifting alone, but also for other offenses. App. 19, 27–28. Included in the five-page list in which respondent's name and "mug shot" appeared were numerous individuals who, like respondent, were never convicted of any criminal activity and whose only "offense" was having once been arrested.[4]

---

[4] Petitioners testified:

"Q. And you didn't limit this to persons who had been convicted of the offense of shoplifting, is that correct?

"A. That's correct.

. . . . .

"Q. Now, my question is what is the basis for your conclusion that a person—a person who has been arrested for the offense of shoplifting is an active shoplifter?

"A. The very fact that he's been arrested for the charge of shoplifting and evidence presented to that effect.

. . . . .

"Q. And this is not based on any finding of the court?

"A. No, sir." App. 26.

"Q. All right. So that if my understanding is correct, this included all persons who were arrested in '71 and '72?

"A. That's true.

"Q. And selected persons from—who were arrested in previous years?

"A. . . . I assume from the number of persons here that many of these have been arrested many years back down the line consecutively . . . .

"Q. So there's no distinction made between persons whose arrest terminated in convictions and persons whose arrest did not terminate in convictions?

"A. No, sir." Id., at 29.

Indeed, respondent was arrested over 17 months before the flyer was distributed,[5] not by state law enforcement authorities, but by a store's private security police, and nothing in the record appears to suggest the existence at that time of even constitutionally sufficient probable cause for that single arrest on a shoplifting charge.[6] Nevertheless, petitioners had 1,000 flyers printed (800 were distributed widely throughout the Louisville business community) proclaiming that the individuals identi-

[5] Respondent was arrested on June 14, 1971. He pleaded not guilty and the charge was "filed away with leave [to reinstate]" on September 22, 1971. The distribution of the flyer was on December 5, 1972. The shoplifting charge was dismissed on December 11, 1972, and respondent filed his complaint the following day. He sought compensatory and punitive damages, and an injunction prohibiting similar dissemination of such flyers in the future and ordering petitioners to obtain the return of the flyers and to instruct those who received them that respondent and the others pictured in the flyers were not "active shoplifters," and had not been convicted of shoplifting or any similar offense. Respondent's only other arrest took place five years previously for a speeding offense.

[6] The Court, by totally excluding a person's interest in his reputation from any cognizance under the Due Process Clause, would be forced to reach the same conclusion that there is no cause of action under § 1983—even to obtain injunctive relief—if petitioners had randomly selected names from the Louisville telephone directory for inclusion in the "active shoplifters" flyer. Of course, even if a person has been arrested on a constitutionally sufficient basis, that does not justify the State's treating him as a criminal.

"The mere fact that a man has been arrested has very little, if any, probative value in showing that he has engaged in any misconduct. An arrest shows nothing more than that someone probably suspected the person apprehended of an offense. When formal charges are not filed against the arrested person and he is released without trial, whatever probative force the arrest may have had is normally dissipated." *Schware* v. *Board of Bar Examiners*, 353 U. S. 232, 241 (1957). The constitutional presumption of innocence, the requirement that conviction for a crime must be based on proof beyond a reasonable doubt, and the other safeguards of a criminal trial are obviously designed at least in part to give concrete meaning to this fact.

fied by name and picture were "subjects *known* to be *active* in this criminal field [shoplifting]," and trumpeting the "fact" that each page depicted *"Active Shoplifters"* (emphasis supplied).[7]

Although accepting the truth of the allegation, as we must on the motion to dismiss, see, *e. g., Walker Process Equipment, Inc.* v. *Food Machinery & Chemical Corp.,* 382 U. S. 172, 174–175 (1965); cf. *Conley* v. *Gibson,* 355 U. S. 41 (1957), that dissemination of this flyer would "seriously impair [respondent's] future employment opportunities" and "inhibit him from entering business establishments for fear of being suspected of shoplifting and possibly apprehended," *ante,* at 697, the Court characterizes the allegation as "mere defamation" involving no infringement of constitutionally protected interests. *E. g., ante,* at 706. This is because, the Court holds, neither a "liberty" nor a "property" interest was invaded by the injury done respondent's reputation and therefore no violation of § 1983 or the Fourteenth Amendment was alleged. I wholly disagree.

It is important, to paraphrase the Court, that "[w]e, too, [should] pause to consider the result should [the Court's] interpretation of § 1983 and of the Fourteenth Amendment be accepted." *Ante,* at 698. There is no attempt by the Court to analyze the question as one of reconciliation of constitutionally protected personal rights and the exigencies of law enforcement. No effort is made to distinguish the "defamation" that occurs when a grand jury indicts an accused from the "defamation" that occurs when executive officials arbitrarily and with-

---

[7] At one point in the flyer, there was also an indication that "[t]hese persons have been arrested during 1971 and 1972 *or* have been active in various criminal fields in high density shopping areas." The stated purpose of the flyer was "so that you, the businessman . . . may inform your security personnel to *watch for* these subjects." *Ante,* at 695 (emphasis supplied).

out trial declare a person an "active criminal." [8]   Rather, the Court by mere fiat and with no analysis wholly excludes personal interest in reputation from the ambit of "life, liberty, or property" under the Fifth and Fourteenth Amendments, thus rendering due process concerns *never* applicable to the official stigmatization, however arbitrary, of an individual.   The logical and disturbing corollary of this holding is that no due process infirmities would inhere in a statute constituting a commission to conduct *ex parte* trials of individuals, so long as the only official judgment pronounced was limited to the public condemnation and branding of a person as a Communist, a traitor, an "active murderer," a homosexual, or any other mark that "merely" carries social opprobrium.   The potential of today's decision is frightening for a free people.[9]   That decision surely finds no support in our relevant constitutional jurisprudence.

---

[8] Indeed, the Court's opinion confuses the two separate questions of whether reputation is a "liberty" or "property" interest and whether, in a particular context, state action with respect to that interest is a violation of due process. *E. g., ante,* at 698–699, 701–702, and n. 3 (assuming that if reputation is a cognizable liberty or property interest, every defamation by a public official would be an offense against the Due Process Clause of the Fifth or Fourteenth Amendment).

[9] Today's holding places a vast and arbitrary power in the hands of federal and state officials.   It is not difficult to conceive of a police department, dissatisfied with what it perceives to be the dilatory nature or lack of efficacy of the judicial system in dealing with criminal defendants, publishing periodic lists of "active rapists," "active larcenists," or other "known criminals."   The hardships resulting from this official stigmatization—loss of employment and educational opportunities, creation of impediments to professional licensing, and the imposition of general obstacles to the right of all free men to the pursuit of happiness—will often be as severe as actual incarceration, and the Court today invites and condones such lawless action by those who wish to inflict punishment without compliance with the procedural safeguards constitutionally required of the criminal justice system.

"In a Constitution for a free people, there can be no doubt that the meaning of 'liberty' must be broad indeed. See, *e. g., Bolling* v. *Sharpe,* 347 U. S. 497, 499–500; *Stanley* v. *Illinois,* 405 U. S. 645." *Board of Regents* v. *Roth,* 408 U. S. 564, 572 (1972). "Without doubt, it denotes not merely freedom from bodily restraint but also the right of the individual . . . generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness by free men." *Meyer* v. *Nebraska,* 262 U. S. 390, 399 (1923).[10] Certainly the enjoyment of

---

[10] One of the more questionable assertions made by the Court suggests that "liberty" or "property" interests are protected only if they are recognized under state law or protected by one of the specific guarantees of the Bill of Rights. *Ante,* at 710, and n. 5. To be sure, the Court has held that "[p]roperty interests . . . are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source *such as* state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Board of Regents* v. *Roth,* 408 U. S. 564, 577 (1972) (emphasis supplied). See also, *e. g., Goss* v. *Lopez,* 419 U. S. 565, 572–573 (1975). However, it should also be clear that if the Federal Government, for example, creates an entitlement to some benefit, the States cannot infringe a person's enjoyment of that "property" interest without compliance with the dictates of due process. Moreover, we have never restricted "liberty" interests in the manner the Court today attempts to do. The Due Process Clause of the Fifth Amendment, like the Due Process Clause of the Fourteenth Amendment, protects "liberty" interests. But the content of "liberty" in those Clauses has never been thought to depend on recognition of an interest by the State or Federal Government, and has never been restricted to interests explicitly recognized by other provisions of the Bill of Rights:

" 'While this Court has not attempted to define with exactness the liberty . . . guaranteed [by the Fourteenth Amendment], the term has received much consideration and some of the included things have been definitely stated. Without doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to

one's good name and reputation has been recognized repeatedly in our cases as being among the most cherished of rights enjoyed by a free people, and therefore as falling within the concept of personal "liberty."

> "[A]s MR. JUSTICE STEWART has reminded us, the individual's right to the protection of his own good name
>
> " 'reflects no more than our basic concept of the essential dignity and worth of every human being— a concept at the root of any decent system of ordered liberty. The protection of private personality, like the protection of life itself, is left primarily to the individual States under the Ninth and Tenth Amendments. But this does not mean that the right is entitled to any less recognition by this Court as a basic of our constitutional system.' *Rosenblatt* v. *Baer,* 383 U. S. 75, 92 (1966) (concurring opinion)." *Gertz* v. *Robert Welch, Inc.,* 418 U. S. 323, 341 (1974).[11]

---

acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness by free men.' *Meyer* v. *Nebraska,* 262 U. S. 390, 399." *Board of Regents* v. *Roth, supra,* at 572.

See also, *e. g., Arnett* v. *Kennedy,* 416 U. S. 134, 157 (1974) (opinion of REHNQUIST, J.). It should thus be clear that much of the content of "liberty" has no tie whatsoever to particular provisions of the Bill of Rights, and the Court today gives no explanation for its narrowing of that content.

[11] It is strange that the Court should hold that the interest in one's good name and reputation is not embraced within the concept of "liberty" or "property" under the Fourteenth Amendment, and yet hold that that same interest, when recognized under state law, is sufficient to overcome the specific protections of the First Amendment. See, *e. g., Gertz* v. *Robert Welch, Inc.; Time, Inc.* v. *Firestone, ante,* p. 448.

We have consistently held that

> " '[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential.' *Wisconsin* v. *Constantineau,* 400 U. S. 433, 437. *Wieman* v. *Updegraff,* 344 U. S. 183, 191; *Joint Anti-Fascist Refugee Committee* v. *McGrath,* 341 U. S. 123; *United States* v. *Lovett,* 328 U. S. 303, 316–317; *Peters* v. *Hobby,* 349 U. S. 331, 352 (DOUGLAS, J., concurring). See *Cafeteria Workers* v. *McElroy,* 367 U. S. 886, 898." *Board of Regents* v. *Roth, supra,* at 573.

See also, *e. g., Greene* v. *McElroy,* 360 U. S. 474, 496 (1959); *Cafeteria Workers* v. *McElroy,* 367 U. S. 886, 899–902 (1961) (BRENNAN, J., dissenting); *Goss* v. *Lopez,* 419 U. S. 565, 574–575 (1975). In the criminal justice system, this interest is given concrete protection through the presumption of innocence and the prohibition of state-imposed punishment unless the State can demonstrate beyond a reasonable doubt, at a public trial with the attendant constitutional safeguards, that a particular individual has engaged in proscribed criminal conduct. "[B]ecause of the certainty that [one found guilty of criminal behavior] would be stigmatized by the conviction . . . a society that values the good name and freedom of every individual should not condemn a man for commission of a crime when there is reasonable doubt about his guilt." *In re Winship,* 397 U. S. 358, 363–364 (1970). "It is also important in our free society that every individual going about his ordinary affairs have confidence that his government cannot adjudge him guilty of a criminal offense without convincing

a proper factfinder of his guilt with utmost certainty."
*Id.,* at 364.[12]

Today's decision marks a clear retreat from *Jenkins v.
McKeithen,* 395 U. S. 411 (1969), a case closely akin to
the factual pattern of the instant case, and yet essentially
ignored by the Court. *Jenkins,* which was also an action
brought under § 1983, both recognized that the
public branding of an individual implicates interests cog-
nizable as either "liberty" or "property," and held that
such public condemnation cannot be accomplished with-
out procedural safeguards designed to eliminate arbitrary
or capricious executive action. *Jenkins* involved the
constitutionality of the Louisiana Labor-Management
Commission of Inquiry, an executive agency whose "very
purpose . . . is to find persons guilty of violating criminal
laws without trial or procedural safeguards, and to publi-
cize those findings." 395 U. S., at 424.

> "[T]he personal and economic consequences alleged
> to flow from such actions are sufficient to meet the
> requirement that appellant prove a legally redress-
> able injury. Those consequences would certainly
> be actionable if caused by a private party and thus
> should be sufficient to accord appellant standing.
> See *Greene v. McElroy,* 360 U. S. 474, 493, n. 22

---

[12] The Court's insensitivity to these constitutional dictates is par-
ticularly evident when it declares that because respondent had never
been brought to trial, "his guilt or innocence of that offense [shop-
lifting] had never been resolved." *Ante,* at 696. It is hard to con-
ceive of a more devastating flouting of the presumption of innocence,
"that bedrock 'axiomatic and elementary' principle whose 'enforce-
ment lies at the foundation of the administration of our criminal
law.'" *In re Winship,* 397 U. S., at 363, quoting *Coffin v. United
States,* 156 U. S. 432, 453 (1895). Moreover, even if a person was
once convicted of a crime, that does not mean that he is "actively
engaged" in that activity now.

(1959); *Joint Anti-Fascist Refugee Committee* v. *McGrath, supra,* at 140–141 (opinion of Burton, J.); *id.,* at 151–160 (Frankfurter, J., concurring). It is no answer that the Commission has not itself tried to impose any direct sanctions on appellant; it is enough that the Commission's alleged actions will have a substantial impact on him. . . . Appellant's allegations go beyond the normal publicity attending criminal prosecution; he alleges a concerted attempt publicly to brand him a criminal without a trial." *Id.,* at 424–425.

Significantly, we noted that one defect in the Commission was that it "exercises a function very much akin to making an official adjudication of criminal culpability," and that it was "concerned only with exposing violations of criminal laws by specific individuals." *Id.,* at 427. "[I]t is empowered to be used and allegedly is used to find named individuals guilty of violating the criminal laws of Louisiana and the United States and to brand them as criminals in public." *Id.,* at 428. See also *ibid.,* quoting *Hannah* v. *Larche,* 363 U. S. 420, 488 (1960) (Frankfurter, J., concurring in result). Although three Justices in dissent would have dismissed the complaint for lack of standing, since there were no allegations that the appellant would be investigated, called as a witness, or named in the Commission's findings, 395 U. S., at 436 (Harlan, J., dissenting), they nevertheless observed, *id.,* at 438:

"[There is] a constitutionally significant distinction between two kinds of governmental bodies. The first is an agency whose sole or predominant function, without serving any other public interest, is to expose and publicize the names of persons it finds guilty of wrongdoing. To the extent that such a determination—whether called a 'finding' or an 'ad-

judication'—finally and directly affects the substantial personal interests, I do not doubt that the Due Process Clause may require that it be accompanied by many of the traditional adjudicatory procedural safeguards. Cf. *Joint Anti-Fascist Refugee Committee* v. *McGrath,* 341 U. S. 123 (1951)."

See also *id.,* at 442. Thus, although the Court was divided on the particular procedural safeguards that would be necessary in particular circumstances, the common point of agreement, and the one that the Court today inexplicably rejects, was that the official characterization of an individual as a criminal affects a constitutional "liberty" interest.

The Court, however, relegates its discussion of *Jenkins* to a dissembling footnote. First, the Court ignores the fact that the Court in *Jenkins* clearly recognized a constitutional "liberty" or "property" interest in reputation sufficient to invoke the strictures of the Fourteenth Amendment.[13] It baffles me how, in the face of that holding, the Court can come to today's conclusion by reliance on the fact that the conduct in question does not "come within the language" of the *dissent* in *Jenkins, ante,* at 706 n. 4. Second, and more important, the Court's footnote manifests the same confusion that pervades the remainder of its opinion; it simply fails to recognize the crucial difference between the ·question whether there is a personal interest in one's good name and reputation that is constitutionally cognizable as a "liberty" or "property" interest within the Fourteenth and Fifth Amendment Due Process Clauses, and the totally separate question whether particular government

---

[13] Of course, such oversights are typical of today's opinion. Compare, *e. g.,* the discussions of *Goss* v. *Lopez,* 419 U. S. 565 (1975), *ante,* at 710, and n. 15, *infra;* the discussions of *Wisconsin* v. *Constantineau,* 400 U. S. 433 (1971), *ante,* at 707–709, and *infra,* at 729–730.

action with respect to that interest satisfies the mandates of due process. See, *e. g., supra,* at 720–721, and n. 8. Although the dissenters in *Jenkins* thought that the Commission's procedures complied with due process, they clearly believed that there was a personal interest that had to be weighed in reaching that conclusion.[14] The dissenters in *Jenkins,* like the Court in *Hannah* v. *Larche, supra,* held the view that in the context of a *purely investigatory, factfinding agency,* full trial safeguards are not required to comply with due process. But that question would never have been reached unless there were some constitutionally cognizable personal interest making the inquiry necessary—the interest in reputation that is af-

---

[14] For example, in addition to the statements already quoted in text, the dissenters observed: .

"The Commission thus bears close resemblance to certain federal administrative agencies . . . . These agencies have one salient feature in common, which distinguishes them from those designed simply to 'expose.' None of them is the *final* arbiter of anyone's guilt or innocence. Each, rather, plays only a *preliminary* role, designed, in the usual course of events, to *initiate* a subsequent formal proceeding in which the accused will enjoy the full panoply of procedural safeguards. For this reason, and because such agencies could not otherwise practicably pursue their investigative functions, they have not been required to follow 'adjudicatory' procedures." 395 U. S., at 439.

"Although in this respect the Commission is not different from the federal agencies discussed above, I am not ready to say that the collateral consequences of government-sanctioned opprobrium may not under some circumstances entitle a person to some right, consistent with the Commission's efficient performance of its investigatory duties, to have his public say in rebuttal. However, the Commission's procedures are far from being niggardly in this respect. . . .

". . . It may be that some of my Brethren understand the complaint to allege that in fact the Commission acts primarily as an agency of 'exposure,' rather than one which serves the ends required by the state statutes. If so—although I do not believe that the complaint can be reasonably thus construed—the area of disagreement between us may be small or nonexistent." *Id.,* at 442.

fected by public "exposure." The Court, by contrast, now implicitly repudiates a substantial body of case law and finds no such constitutionally cognizable interest in a person's reputation, thus foreclosing *any* inquiry into the procedural protections accorded that interest in a given situation.

In short, it is difficult to fathom what renders respondent's interest in his reputation somehow different from the personal interest affected by " 'an agency whose sole or predominant function, without serving any other public interest, is to expose and publicize the names of persons it finds guilty of wrongdoing.' " *Ante,* at 706 n. 4, quoting 395 U. S., at 438. Surely the difference cannot be found in the fact that police officials rather than a statutory "agency" engaged in the stigmatizing conduct, for both situations involve the requisite action "under color of" law. *Ante,* at 697 n. 2. Nor can the difference be found in the argument that petitioners' actions were "serving any other public interest," for that consideration *only* affects the outcome of the due process balance in a particular case, not whether there is a personal "liberty" interest to be weighed against the government interests supposedly justifying the State's official actions. It is remarkable that the Court, which is so determined to parse the language of other cases, see generally *ante,* Part II, can be thus oblivious to the fact that *every* Member of the Court so recently felt that the intentional, public exposure of alleged wrongdoing—like the branding of an individual as an "active shoplifter"—implicates a constitutionally protected "liberty" or "property" interest and requires analysis as to whether procedures adequate to satisfy due process were accorded the accused by the State.

Moreover, *Wisconsin* v. *Constantineau,* 400 U. S. 433 (1971), which was relied on by the Court of Appeals in this case, did not rely at all on the fact asserted by the

Court today as controlling—namely, upon the fact that "posting" denied Ms. Constantineau the right to purchase alcohol for a year, *ante,* at 708–709. Rather, *Constantineau* stated: "The *only* issue present here is whether the label or characterization given a person by 'posting,' though a mark of serious illness to some, is to others such a stigma or badge of disgrace that procedural due process requires notice and an opportunity to be heard." 400 U. S., at 436 (emphasis supplied). In addition to the statements quoted by the Court, *ante,* at 707–708, the Court in *Constantineau* continued: " 'Posting' under the Wisconsin Act may to some be merely the mark of illness, to others it is a stigma, an official branding of a person. The label is a degrading one. Under the Wisconsin Act, a resident of Hartford is given no process at all. This appellee was not afforded a chance to defend herself. She may have been the victim of an official's caprice. Only when the whole proceedings leading to the pinning of an unsavory label on a person are aired can oppressive results be prevented." 400 U. S., at 437. " '[T]he right to be heard before being condemned to suffer grievous loss of any kind, *even though it may not involve the stigma and hardships of a criminal conviction,* is a principle basic to our society.' " *Ibid.,* quoting *Joint Anti-Fascist Refugee Comm.* v. *McGrath,* 341 U. S. 123, 168 (1951) (Frankfurter, J., concurring) (emphasis supplied). There again, the fact that government stigmatization of an individual implicates constitutionally protected interests was made plain.[15]

---

[15] Even more recently, in *Goss* v. *Lopez,* 419 U. S. 565 (1975), we recognized that students may not be suspended from school without being accorded due process safeguards. We explicitly referred to "the liberty interest in reputation" implicated by such suspensions, *id.,* at 576, based upon the fact that suspension for certain actions would stigmatize the student, *id.,* at 574–575:

"The Due Process Clause also forbids arbitrary deprivations of

Thus, *Jenkins* and *Constantineau*, and the decisions upon which they relied, are cogent authority that a person's interest in his good name and reputation falls

---

liberty. 'Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him,' the minimal requirements of the Clause must be satisfied. *Wisconsin* v. *Constantineau*, 400 U. S. 433, 437 (1971); *Board of Regents* v. *Roth, supra*, at 573. School authorities here suspended appellees from school for periods of up to 10 days based on charges of misconduct. If sustained and recorded, those charges could seriously damage the students' standing with their fellow pupils and their teachers as well as interfere with later opportunities for higher education and employment. It is apparent that the claimed right of the State to determine unilaterally and without process whether that misconduct has occurred immediately collides with the requirements of the Constitution."

The Court states that today's holding is "quite consistent" with *Goss* because "Ohio law conferred a right upon all children to attend school, and . . . the act of the school officials suspending the student there involved resulted in a denial or deprivation of that right." *Ante*, at 710. However, that was only one-half of the holding in *Goss*. The Ohio law established a *property* interest of which the Court held a student would not be deprived without being accorded due process. 419 U. S., at 573–574. However, the Court also specifically recognized that there was an independent *liberty* interest implicated in the case, not dependent upon the statutory right to attend school, but based, as noted above, on the fact that suspension for certain conduct could affect a student's "good name, reputation, honor, or integrity." *Id.*, at 574–575.

Similarly, the idea that the language in *Board of Regents* v. *Roth, supra*, is "quite inconsistent with any notion that a defamation perpetrated by a government official but unconnected with any refusal to rehire would be actionable," *ante*, at 709, borders on the absurd. The Court in *Roth*, like the Court in *Goss*, explicitly quoted the language from *Constantineau* that the Court today denigrates, *ante*, at 707–709, and it was clear that *Roth* was focusing on stigmatization as such. We said there that when due process safeguards are required in such situations, the "purpose of such notice and hearing is to provide the person an opportunity *to clear his name*," 408 U. S., at 573 n. 12 (emphasis supplied), and only found no requirement for due process safeguards because "[i]n the present case . . . there

within the broad term "liberty" and clearly require that
the government afford procedural protections before in-
fringing that name and reputation by branding a person
as a criminal. The Court is reduced to discrediting the
clear thrust of *Constantineau* and *Jenkins* by exclrding
the interest in reputation from all constitutional protec-
tion "if there is any other possible interpretation" by
which to deny their force as precedent according con-
stitutional protection for the interest in reputation.[16]
*Ante,* at 708. The Court's approach—oblivious both to
Mr. Chief Justice Marshall's admonition that "we must
never forget, that it is *a constitution* we are expounding,"
*M'Culloch* v. *Maryland,* 4 Wheat. 316, 407 (1819),
and to the teaching of cases such as *Roth* and *Meyer,*
which were attentive to the necessary breadth of consti-
tutional "liberty" and "property" interests, see nn. 10, 15,
*supra*—is to water down our prior precedents by reinter-

---

is no suggestion whatever that the respondent's 'good name, reputa-
tion, honor, or integrity' is at stake." *Id.,* at 573. See also
*Arnett* v. *Kennedy,* 416 U. S., at 157 (opinion of REHNQUIST, J.)
("[L]iberty is not offended by dismissal from employment itself,
but instead by dismissal based upon an unsupported charge which
could wrongfully injure the reputation of an employee . . . . [T]he
purpose of the hearing in such a case is to provide the person 'an
opportunity to clear his name' . . ."). The fact that a stigma is
imposed by the government in terminating the employment of a
government employee may make the existence of state action un-
questionable, but it surely does not detract from the fact that the
operative "liberty" concept relates to the official stigmatization of
the individual, whether imposed by the government in its status
as an employer or otherwise.

[16] Similar insensitivity is exhibited by the Court when it declares
that respondent "has pointed to no specific constitutional guarantee
safeguarding the interest he asserts has been invaded." *Ante,* at 700.
The gravamen of respondent's complaint is that he has been stigma-
tized as a criminal without *any* of the constitutional protections
designed to prevent an erroneous determination of criminal
culpability.

preting them as confined to injury to reputation that affects an individual's employment prospects or, as "a right or status previously recognized by state law [that the State] distinctly altered or extinguished." *Ante,* at 711. See also, *e. g., ante,* at 701, 704–706, 709–710, 710–712. The obvious answer is that such references in those cases (when there even were such references) concerned the particular fact situations presented, and in nowise implied any limitation upon the application of the principles announced, *E. g., ante,* at 709–710, quoting *Board of Regents* v. *Roth,* 408 U. S., at 573. See n. 15, *supra.* Discussions of impact upon future employment opportunities were nothing more than recognition of the logical and natural consequences flowing from the stigma condemned. *E. g., ante,* at 705–706, quoting *Cafeteria Workers* v. *McElroy,* 367 U. S., at 898.[17]

---

[17] The import of these cases and the obvious impact of official stigmatization as a criminal were not lost on the Court of Appeals in this case:

"This label ['active shoplifter'] carries with it the badge of disgrace of a criminal conviction. Moreover, it is a direct statement by law enforcement officials that the persons included in the flyer are presently pursuing an active course of criminal conduct. All of this was done without the slightest regard for due process. There was no notice nor opportunity to be heard prior to the distribution of the flyer, and appellant and others have never been accorded the opportunity to refute the charges in a criminal proceeding. It goes without saying that the Police Chiefs cannot determine the guilt or innocence of an accused in an administrative proceeding. Such a determination can be made only in a court of law.

"The harm is all the more apparent because the branding has been done by law enforcement officials with the full power, prestige and authority of their positions. There can be little doubt that a person's standing and associations in the community have been damaged seriously when law enforcement officials brand him an active shoplifter, accuse him of a continuing course of criminal conduct, group him with criminals and distribute his name and photograph to the merchants and businessmen of the community. Such acts are a direct and devastating attack on the good name, reputa-

Moreover, the analysis has a hollow ring in light of the Court's acceptance of the truth of the allegation that the "active shoplifter" label would "seriously impair [respondent's] future employment opportunities." *Ante,* at 697. This is clear recognition that an official "badge of infamy" affects tangible interests of the defamed individual and not merely an abstract interest in how people view him; for the "badge of infamy" has serious consequences in its impact on no less than the opportunities open to him to enjoy life, liberty, and the pursuit of happiness. It is inexplicable how the Court can say that a person's status is "altered" when the State suspends him from school, revokes his driver's license, fires him from a job, or denies him the right to purchase a drink of alcohol, but is in no way "altered" when it officially pins upon him the brand of a criminal, particularly since the Court recognizes how deleterious will be the consequences that inevitably flow from its official act. See, *e. g., ante,* at 708–709, 711–712. Our precedents clearly mandate that a person's interest in his good name and reputation is cognizable as a "liberty" interest within the meaning of the Due Process Clause, and the Court has simply failed to distinguish those precedents in any rational manner in holding that no invasion of a "liberty" interest was effected in the official stigmatizing of respondent as a criminal without any "process" whatsoever.

I have always thought that one of this Court's most important roles is to provide a formidable bulwark against governmental violation of the constitutional safe-

---

tion, honor and integrity of the person involved. The fact of an arrest without more may impair or cloud a person's reputation. *Michelson* v. *United States,* 335 U. S. 469, 482 ... (1948). Such acts on the part of law enforcement officials may result in direct economic loss and restricted opportunities for schooling, employment and professional licenses. *Menard* v. *Mitchell,* 139 U. S. App. D. C. 113, 430 F. 2d 486, 490 (1970)." 505 F. 2d 1180, 1183 (1974).

guards securing in our free society the legitimate expectations of every person to innate human dignity and sense of worth. It is a regrettable abdication of that role and a saddening denigration of our majestic Bill of Rights when the Court tolerates arbitrary and capricious official conduct branding an individual as a criminal without compliance with constitutional procedures designed to ensure the fair and impartial ascertainment of criminal culpability. Today's decision must surely be a short-lived aberration.[18]

---

[18] In light of my conviction that the State may not condemn an individual as a criminal without following the mandates of the trial process, I need not address the question whether there is an independent right of privacy which would yield the same result. Indeed, privacy notions appear to be inextricably interwoven with the considerations which require that a State not single an individual out for punishment outside the judicial process. Essentially, the core concept would be that a State cannot broadcast even such factual events as the occurrence of an arrest that does not culminate in a conviction when there are no legitimate law enforcement justifications for doing so, since the State is chargeable with the knowledge that many employers will treat an arrest the same as a conviction and deny the individual employment or other opportunities on the basis of a fact that has no probative value with respect to actual criminal culpability. See, e. g., *Michelson* v. *United States*, 335 U. S. 469, 482 (1948); *Schware* v. *Board of Bar Examiners*, 353 U. S., at 241. A host of state and federal courts, relying on both privacy notions and the presumption of innocence, have begun to develop a line of cases holding that there are substantive limits on the power of the government to disseminate unresolved arrest records outside the law enforcement system, see, e. g., *Utz* v. *Cullinane*, 172 U. S. App. D. C. 67, 520 F. 2d 467 (1975); *Tarlton* v. *Saxbe*, 165 U. S. App. D. C. 293, 507 F. 2d 1116 (1974); *United States* v. *Dooley*, 364 F. Supp. 75 (ED Pa. 1973); *Menard* v. *Mitchell*, 328 F. Supp. 718, 725–726 (DC 1971), rev'd on other grounds, 162 U. S. App. D. C. 284, 498 F. 2d 1017 (1974); *United States* v. *Kalish*, 271 F. Supp. 968 (PR 1967); *Davidson* v. *Dill*, 180 Colo. 123, 503 P. 2d 157 (1972); *Eddy* v. *Moore*, 5 Wash. App. 334, 487 P. 2d 211 (1971). I fear that after

today's decision, these nascent doctrines will never have the opportunity for full growth and analysis. Since the Court of Appeals did not address respondent's privacy claims, and since there has not been substantial briefing or oral argument on that point, the Court's pronouncements are certainly unnecessary. Of course, States that are more sensitive than is this Court to the privacy and other interests of individuals erroneously caught up in the criminal justice system are certainly free to adopt or adhere to higher standards under state law. See, e. g., *Michigan* v. *Mosley,* 423 U. S. 96, 111, 120–121 (1975) (BRENNAN, J., dissenting).

MR. JUSTICE WHITE does not concur in this footnote.