Syed J. Iqbal JAFREE,
Plaintiff-Appellant,

v.

William J. SCOTT, Individually and as Attorney General of the State of Illinois, et al., Defendants-Appellees.

Nos. 76–2220, 78–1103.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 3, 1978.

Decided Nov. 7, 1978.

Rehearing Denied Dec. 6, 1979.

Syed M. Jafree, pro se, Sheldon R. Waxman, Chicago, Ill., for plaintiff-appellant.

Herbert Lee Caplan, Chicago, Ill., for defendants-appellees.

Before CUMMINGS, PELL and TONE, Circuit Judges.

PER CURIAM.

The root of the claims involved in the present consolidated appeals by Jafree [1] is before this court for the second time. In our order of June 25, 1975, with one narrow exception, we affirmed the judgment of the district court dismissing by way of summary judgment Jafree's cause of action.[2] While Jafree is continuing to contend that he remains to this day an assistant Attorney General of Illinois, our prior decision clearly puts to rest any such claim as we affirmed the district court's judgment that he had no property interest in his employment and that he was subject to the summary dismissal which occurred.

In our decision of 1975 we did note that it was not clear, however, that some liberty interest of Jafree may not have been violated by claimed stigmatizing communications following the discharge, particularly one from Scott to the American Civil Liberties Union. We therefore stated in our holding,

> Reluctantly, because of doubt from the entire record as to Jafree's ultimate ability to sustain the liberty position he asserts, we conclude, notwithstanding the borderline aspects of the particular issue, that there was sufficient matter presented outside the pleading as to require at the least further exploration via summary judgment procedure and if that does not eliminate the issue of fact, then a trial on the liberty interest issue.

In view of some narrowing of concepts in the matter of the liberty interest issue since our prior decision, see *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405

---

1. Appeal No. 76–2220 was instituted by a notice of appeal filed June 9, 1976. The scope of this appeal is discussed hereinafter. Appeal No. 78–1103 was instituted by a notice of appeal filed January 11, 1978, and was directed at the denial of Jafree's Rule 60(b) motion by

order entered in the action on December 15, 1977, formally entered on December 19, 1977.

2. The initial judgment of the district court is reported at *Jafree v. Scott*, 372 F.Supp. 264 (N.D.Ill.1974). The decision of this court was an unreported order in Appeal No. 74–1295.

(1976), and *Schwartz v. Thompson*, 497 F.2d 430 (2d Cir. 1974), we might well have second thoughts as to the correctness of the prior disposition. That issue, however, is not directly before us so we will address only the issue which is properly before us.

■ In determining what that issue is, we look first at the notice of appeal filed June 9, 1976. That notice purports to launch an appeal not only as to the May 7, 1976 (formally entered May 10, 1976) order denying Jafree's first 60(b) motion but also as to the judgment of dismissal dated March 30, 1976.[3] As far as the judgment of March 30 was concerned the 30 days for filing notice of appeal was long past, there was no extension of time requested, and even if there had been an additional 30 days as allowed by Rule 4, F.R.A.P., it also would have expired prior to June 9, 1976. The 60(b) motion was filed within the 30 day period after the judgment of dismissal but "Rule 60(b) was not intended to be an alternative method to obtain review by appeal or as a means of enlarging by indirection the time for appeal." *Swam v. United States*, 327 F.2d 431, 433 (7th Cir.) *cert. denied*, 379 U.S. 852, 85 S.Ct. 98, 13 L.Ed.2d 55 (1964). The reference in the notice to the judgment, therefore, is without effect because of the lack of timeliness. The failure to appeal the judgment of dismissal is of some significance because of the contention raised on appeal for the first time, at least as far as either 60(b) motion is concerned, that in some way Jafree was excused from prosecuting his action because the defendants had not answered certain interrogatories. This was a matter plainly visible in the record before the district court, unlike Jafree's absence from the country raised on the first 60(b) motion and the alleged fraud of defendants and their collusion with the

union attorney formerly representing Jafree raised in the second 60(b) motion. The record reflected that the interrogatories had not been answered and we regard the failure of Jafree to raise this by direct appeal as a waiver.[4]

■ Even if there were no waiver we would not view the dismissal for want of prosecution as an abuse of discretion. The defendant's answers to the interrogatories were overdue when the court struck plaintiff's affidavit and ordered another one filed within ten days and when the court later extended that time for two weeks. It must be assumed that the court determined that plaintiff should be required to file a new affidavit regardless of whether the interrogatories had been answered, which it plainly had power to do. Plaintiff's failure to comply with the court's order was an adequate basis for dismissal.

■ It should also be remembered that the basic duty of prosecuting the action remains on the plaintiff who has brought it, not the court before which it pends nor the defendant who generally, in any event, is an unwilling participant in the proceedings. It is quite sufficient to justify dismissal if the plaintiff does nothing, as he knows that until something is done there will be no trial. *See Forest Nursery Company v. Crete Carrier Corporation*, 319 F.Supp. 213, 215 (E.D.Tenn.1970).

There remains then for decision the matter of the propriety of the district court's denial of relief on the two 60(b) motions. This is all that is before the court despite the mass of wide-ranging, often conclusory, material from Jafree by means of briefs, motions, and correspondence which can only be regarded as a counter-stigmatization

---

**3.** In the voluminous file that has accumulated in this court in appeal No. 76–2220 alone, we do note a question having been raised as to whether the dismissal of March 30, 1976, was a final judgment. This matter was settled by this court's order of December 2, 1977.

For a recent general discussion of the interrelationship between Rule 60(b) motions, judgments, and other post judgment motions, see

*Browder v. Director, Department of Corrections of Illinois*, 434 U.S. 257, 263 n.7, 98 S.Ct. 556, 54 L.Ed.2d 521 (1978).

**4.** We have accepted for the present purpose Jafree's contention that the interrogatories were not answered, which the defendants denied at oral argument, the record brought to us by appellant being not as complete as it should be.

program with a self-encomiastic background.[5]

In considering the two motions we first note that "[i]t is well settled that neither a dismissal with prejudice for failure to prosecute nor a refusal to vacate such a judgment will be reversed on appeal except for abuse of discretion." *Redac Project 6426, Inc. v. Allstate Ins. Co.*, 412 F.2d 1043, 1046 (2d Cir. 1969). Moreover, in reviewing the denial of a 60(b) motion, the appellate court's function generally "is not to determine whether the court was substantively correct in entering the judgment from which relief is sought but is limited to deciding whether the judge abused his discretion in ruling that sufficient grounds for disturbing the finality of the judgment were not shown in a timely manner." *Brennan v. Midwestern United Life Insurance Company*, 450 F.2d 999, 1003 (7th Cir. 1971), *cert. denied*, 405 U.S. 921, 92 S.Ct. 957, 30 L.Ed.2d 792 (1972).[6]

■ The sum of Jafree's 60(b) motions is that he relies on subdivisions (1), (4), and (6) of that rule. On the facts of the present case we are not persuaded that the district court abused its discretion in denying the motions. The motion under subdivision (1) on the ground of excusable neglect did not show grounds for vacating the order of dismissal, which as we have said was not an abuse of discretion when entered. Judge Decker, following the implicit direction of this court in its prior order for "further exploration via summary judgment procedure," had ordered Jafree to file an affidavit with regard to alleged stigmatory statements directed at him. Jafree had been granted several extensions of time and had failed to file an adequate affidavit. As the judge noted, the fact that Jafree was in England does not excuse his neglect inasmuch as his attorney was here in Chicago and could have sought another extension if communication with the client was difficult.

■ As already indicated herein, there is no basis for claiming a void judgment under subdivision (4). As to subdivision (6), the conclusory generalized statements regarding corruption, or collusion, or fraud by his former attorney in failing to file the necessary affidavit is insufficient in our opinion for us to say that the court abused its discretion.

Finding that there was no abuse of discretion, the orders of the district court in denying the Rule 60(b) motions and the judgment at which the motions were directed are affirmed.

AFFIRMED.

### No. 76–2220—ADDENDUM

*General conclusory claims of violations of constitutional rights*

"So much blood of Assistant Attorney General Syed M.J. Iqbal Jafree (Appellant) has been washed underneath the bridges and down the sewage of jurisprudence in the State of Illinois during the Era of NiXXonites [sic] that no amount of recounting would do sufficient justice."

"[E]ach page of this avant-garde brief incorporates by reference as part and parcel of this brief all that has been said before, and does not exclude the cries of three little children (Jafree's) whose American dreams have been systemically [sic] BUTCHERED (the Honorable Oriental means it, very seriously!)."

"Plaintiff has suffered horrendous pain and mental anguish and has been irreparably injured in his profession and community esteem. Every day fresh, new, unique and distinct causes of action have arisen in favor of the plaintiff and against the Defendant."

---

**5.** A sample, and only that, to which we refer is appended to this opinion as an addendum by categories.

**6.** This court also observed in *Brennan* that notwithstanding that the finality of judgments ought not to be disturbed except on very narrow grounds, the rule should have a sufficiently liberal construction that judgments which are void or are vehicles of injustice not be left standing. *Id.* On the entire record in this case, we do not regard the judgment as being such a vehicle and it certainly is not void.

"Plaintiff's family has languished in hopelessness and poverty and without adequate medical care or economic resources. Plaintiff and his family had to live in poverty housing (they have the dignity of not going on public welfare) at a time when an avalanche of rash claims are being made about the keen demand of and for minority lawyers."

*Claims concerning district court—Judge Bauer*

"Judge Bauer (since elevated) dismissed the lawsuit 73C2447 and in his amazing Memorandum Opinion steered clear of the primal issue . . . ." ". . . Judge Bauer chose to invent his own facts."

"Judge Bauer went deeply into *obiter dicta,* . . . ."

"THIS matter which has taken some 6 years (because Judges Bauer or Decker had no intention of doing justice) . . . ."

*Claims concerning district court—Judge Decker*

"From London Jafree used to telephone every 10–14 days, sometime [sic] twice a week to his lawyers; he was told that everything was under control; . . . that they were expediting as much as they could but Judge Decker (a personal friend of Scott) was 'foot-dragging'."

"THIS matter which has taken 6 years (because Judges Bauer or Decker had no intention of doing justice) . . . ."

*Claims concerning William Scott and other defendants*

"Scott also claimed that Jafree is mentally ill, and a homosexual."

"Scott has also falsely accused Jafree of dishonesty, immorality, incompetence and other perversions which from Scott's mouth are particularly damaging. When a crook calls a noncrook a crook, it is more than crooked."

"Scott has used two hatchetmen to tout that Jafree is not a lawyer." . . . "Scott has dismissed former Chief of Opinions, defenant-appellee [sic]: Calvin Bostian

(Jafree has predicted this in 1973, 1974 that Scott will throw Bostian out of the window, after he is of no use, like a used candom)." [Sic]

"Scott has electronically harassed Jafree and claims that judges are under his thumb and Jafree has as much chance of receiving justice in Illinois as a 'snowflake in hell.' "

"Scott's bossom [sic] friend Nettles used to refer to all minorities including white jews, openly, as "Niggers" and kept a diary of the number of niggers visiting the Office in springfield; [sic] . . . ."

"Scott merely pulled the wool over the eyes of the courts by artfully interjectiung-ting [sic] extraneous matters."

"Maybe Scott stole this letter afterwards to seek to legitimitize [sic] his earlier criminal activities."

"May be [sic] Scott wants to hide the fact that almighty William Scott is morally as well as mentally handicapped."

"In this case Scott's stigmatory letter was published worldwide by Scott."

"To Scott, every foreign-born person is lacking in clarity or hard of hearing. Sad!"

"It seems to me that the only creditable statement he [Scott] has made is that judges in Illinois are under his thumb: I have steadfastly refused to believe it."

"Defendant Scott,. not satisfied with the above, has himself unleashed or caused to be unleashed unsurpassed venom, slanders and stigmas against the Plaintiff who has had no opportunity to defend himself against such slurs, innuendos and miscellaneous skunk systems."

"Defendant's Game Plan has been to destroy Plaintiff's credibility, to tarnish Plaintiff's public image and to alienate everybody against and isolate the Plaintiff."

"Defendant Scott has invaded the Privacy of Plaintiff Jafree through unconstitutional, civil and unfair means and in various manners by harassing his family, obstructing and tampering with Plaintiff's mail himself or through his agents, associates, servants and other relations. Defendant further, through harassment tactics drove

the family of the plaintiff out of Spring-field . . . ."

"Jafree was stigmatized by Defendant Scott's favourite clerk Nettles on 6 July 73 and by Scott's faithful servant Bostian on or about 16 July 73 (when Bostian tried to blackmail Jafree) and was further Stigma-tized by Scott on 27 July 1973; by O'rourke and verbally by other servants, commissars and hatchetmen of Scott. This Stigmatiza-tion has flourished and has been accelerated everyday since 6 July 1973.

"Scott's agents have telephoned every ma-jor corporation and have even tried to buy dirt on Jafree in Pakistan. Filthier lan-guage, dirtier tricks and greater clout has been used than in Watergate . . . ."

### Claims concerning his own attorneys

"[U]nder some pre-arrangement with de-fendants. Jafree's Union-supplied lawyers unilaterally abondoned [sic] the lawsuit . . . ."

"It has turned out that Gilbert Cornfield used this case (an ideal lawsuit) as a "guin-ea pig" for imparting federal litigation ex-perience to his novice assistant Jacob Pom-eranz. There have been so many unethical practices and so much conduct unbecoming attorneys by these two (and their law firm) that this matter was referred to the Attor-ney Registration and Disciplinary Commis-sion by Jafree last year and is yet to be investigated."

"Incidentally, Cornfield completely rewrote the Petition that was drafted by Jafree. There is evidence of collusion from the be-ginning."

"In all probability Cornfield designed this affidavit, in arrangement with Scott."

### Self-encomiums

"Jafree was told that he could soon become the first Asian United States District Court Judge in the continental USA."

"Jafree has applied for the next United States District Judgeship in Chicago and will sue if Carter appoints a lesser lawyer or man . . . ."

"*And I will win* [nobody can outclass me as a civil rights lawyer]."

"It should have done justice that it would expect, had Jafree been the judge (indeed, he is fully qualified)."

### Other litigation and claims

The record brought to this court by Ja-free reflects that he is no stranger to find-ing appropriate words to claim a discrimina-tory discharge. Thus we note a thirteen page pro se petition (single spaced on legal size paper) filed on December 17, 1971, in the United States District Court for the Eastern District of Washington against the President of Central Washington State Col-lege, seeking a temporary injunction, de-claratory judgment, "and other proper re-dress" in which the following allegations are noted:

"Mr. John D. Green, as I were to learn later on, wrote dozens of defamatory and sugges-tive letters. One example EXH E.1. is en-closed; others will be presented later and some may have to be subpoenaed from dif-ferent sources. The idea of such letters was to condemn me professionally and to have me deported. Only God knows how many letters were written, using the re-sources of the State of Washington. I lost several job offers elsewhere. The idea was not simply to oust me but to disgrace and defame me internationally and so severely that I would "voluntarily" bow out both out of the College as well as life. I have learnt [sic] a scheme was hatched to completely and I mean thoroughly "destroy" me. . . It was calculated, I learnt [sic] later, that I would stampede and commit suicide. . . This was a plot to destroy a man through slurs, [sic] innuendoes, gossipmongering and words of mouth and it was brilliantly accomplished."

"Prior to my departure, a series of incidents of criminal nature occured [sic], my paint-ing was stolen; several of my works were vandalized; threats to my life were made by Mr. Papadopoulos threatened to kill me and my wife if we remain in Ellensburg; notices: "Jafree Go Back to Hell" and say-ing other sickening things went up; threat-

ening and obscene calls were made. I reported these incidents to CWSC Security Police (they, I am told have full Police powers), no action was taken. It was a grand conspiracy to completely annihilate me through innuendoes and threats."

"Furthermore my mail was intercepted, censored, damaged and stolen. Several letters never reached me. Mr. Steven D. Milam put a notice on my Office door forbidding entry, presumably me and my lock was changed in my absence without informing or getting my permission. My June, 1971 salary was withheld and arbitrary deductions made (in an effort to louse up and destroy my credit)."

"I rushed to Ellensburg, as I foresaw the destruction of my American dream."

"Messrs James Brooks, Steven D. Milam, Edward Harrington, John A. Green, Stephen Bayless, William Dunning and C. Papadopoulos, all members of the CWSC faculty and employees of the State of Washington have done such a comprehensive job of maligning and ruining my reputation so completely locally that no one finds it easy to be of help, even on the grounds that CWSC officials have denied my civil rights within the meaning of 42 U.S.A. Code 1983, 85 and 86 [U.S.C.A. §§ 1983, 1985, 1986]. Grave and gross uncivil liberties have been taken to inhumanely abuse my very humanity. I have experience of law practice in Pakistan, if something like this had happened there, local bar would have defended the accused, so outrageously denied all notions of suggestions of justice, fairness and civil rights . . . . Indeed Messrs James Brooks, Stephen Bayless and Christos Papadopoulos have threatened to kill me and I dont [sic] doubt it very much."

"My resources are barely enough to manage to survive. My wife is pregnant and has been ill. My health is such that I cannot take long distance travelling as my internal bleeding, under physical strain, becomes very intensified. My health has gone bad ever since the harassment at CWSC started.

It seems to me CWSC administration feels that they have a carte blanche to abuse my humanity, to infringe upon my property and possessions."

\* \* \*

When this case was previously before this court we denied the motion of the defendants to supplement their brief "by listing some sixty separate discrimination claims filed by Jafree throughout the United States against some 43 companies or institutions who apparently mostly were employers. The period of this activity ranged from the late 1960's to [1975] This data was not part of the record in the district court . . . ."

This tabulation is now a part of the record in the present appeal.