787 F.2d 591
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
PATRICK R. MARTIN; NORA I. MARTIN, his wife, Plaintiffs-Appellants,
vs.
CITY OF CHARLEVOIX, a Michigan municipal corporation; JAMES
BRINKER; JACK MOL; SAM SUPERNAW; RAYMOND WOOD; JEFFREY
PORTER; ROBERT TIMMS; EARL MUMA; SHIRLEY ROLOFF, jointly and
severally and individually, Defendants-Appellees.
 85-1253
 United States Court of Appeals, Sixth Circuit.
 3/3/86
 
 Before KEITH and GUY, Circuit Judges, and TAYLOR, District Judge.*
 PER CURIAM.
 
 
 1
 Plaintiff Patrick Martin appeals from the dismissal after a bench trial of his 42 U.S.C. Sec. 1983 complaint.[1] Martin, a Charlevoix police officer, claimed a due process violation involving his property and liberty interests as a result of disciplinary action taken against him by the defendants in 1980. On appeal, Martin questions only the trial court's adverse ruling relative to his liberty interest claims. We conclude, as did the district court, that no liberty interest of the plaintiff was implicated by the action of the defendants, and we affirm.
 
 I.
 
 2
 In 1970, plaintiff became a police officer for the City of Charlevoix and, until 1980, his employment was unremarkable except for a three-day suspension in 1973 and three letters of reprimand. Although the City of Charlevoix has only a five-person police department, Martin was treated by at least some of the other officers as an outsider and not 'part of the crowd.'[2]
 
 
 3
 The incident which was the basis for this litigation occurred on October 15, 1980, when Martin reported in for the midnight shift. Martin usually drove car No. 321, but that night he could not find the keys. Officers Kolonich and Meredith told Martin that they were going to be using car No. 322, which left Martin without a car for his shift. Upset and angry, Martin put his gun in his locker and decided to go home. From the time he left the station, Martin was out of contact with the Department. When he got home, he called Councilman Muma to tell him what happened. Muma then called City Manager Brinker, who in turn called Police Chief Mol. As it turned out, Chief Mol had accidently taken the keys home with him. Chief Mol then called Martin and told him to come over and pick up the keys and to get back to work. At that time, he also advised Martin that Martin should have called him first rather than calling a councilman.
 
 
 4
 On November 11, 1980, one month after the key incident, Chief Mol handed Martin a three-day suspension for his behavior with respect to the key incident. The specific reasons given for the suspension were: (1) leaving the tour of duty (being out of contact with the Department while on duty); (2) violation of departmental chain of command (Martin should have initially called Chief Mol after the key incident, not Councilman Muma); and (3) conducting himself in a manner which discredited the Department. Officers Kolonich and Meredith were given verbal reprimands with respect to the incident.
 
 
 5
 Martin then filed a grievance. As a second step in the grievance procedure, Martin met with City Manager Brinker and his union steward. At the meeting, Brinker decided to convert Martin's suspension into a discharge. As reasons, Brinker cited the reasons that were given in support of Martin's original suspension, and included a statement that Martin had lost his effectiveness as a police officer.
 
 
 6
 The third step of the grievance procedure called for a meeting with the City Council. At the meeting, testimony was received and the Council decided not to affirm the discharge. Instead, the Council voted to suspend Martin for 30 days and ordered that he be reinstated upon successful completion of a physical and mental exam. Apparently some of the testimony at this hearing called into question Martin's emotional stability, hence the requirement of a mental examination. The local newspapers covering the meeting noted that, as a condition of reinstatement, Martin had to undergo a physical and a mental examination.
 
 
 7
 After the meeting, Brinker notified Martin that he had arranged an appointment for a mental examination on December 10 in Southfield, Michigan. Martin did not keep this appointment. According to the Council resolution, the City was required to reimburse Martin for travel expenses, but Brinker and Martin never discussed the issue of expenses. On December 20, 1980, Martin received a letter from Brinker explaining that he was discharged for not undergoing the mental examination within the 30 days required by the Resolution. In response, Martin claims he could not afford the trip to Southfield.
 
 
 8
 Following the news of his discharge, Martin appealed his grievance to arbitration. The arbitrator found that both the 30-day suspension and the requirement of a physical and a mental exam were reasonable steps taken by the City. The arbitrator noted that Martin had exhibited poor judgment with respect to the key incident and that Martin's behavior had raised a legitimate issue as to his emotional stability. The arbitrator found, however, that the discharge penalty was too harsh. The arbitrator, therefore, ordered that Martin be reinstated, provided he complete and pass his medical examinations. The arbitrator did not order back pay or accumulated seniority, since Martin's loss of these benefits was a direct result of his failure to comply with the reasonable conditions of his reinstatement.
 
 
 9
 Following the arbitration judgment, Martin passed his physical and mental examinations and was reinstated by the Police Department. Local newspapers carried the story of his passing his physical and mental examinations and his reinstatement which occurred on September 29, 1981.
 
 
 10
 Notwithstanding his reinstatement, Martin instituted this civil rights action in March of 1983. He raises only one issue on appeal following the February, 1985, dismissal of his case:
 
 
 11
 Was Plaintiff's liberty interest implicated when the City of Charlevoix wrongfully discharged him from the Police Department admidst the stigmatizing charges of mental illness?
 
 
 12
 The 'stigmatizing charges of mental illness' occurred, according to Martin, when, at a public meeting of the City Council, the Council converted Martin's discharge into a suspension for 30 days and required as a condition of reinstatement that Martin undergo a physical and a mental examination. Martin notes that after the public meeting several of the local newspapers published the conditions of his reinstatement and, as a result, his reputation in the community has been damaged. However, damage to one's reputation, in and of itself, does not implicate a protected liberty interest.
 
 
 13
 In Paul v. Davis, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), the Supreme Court held that a damaged reputation alone is insufficient to implicate a constitutional liberty interest. A plaintiff must also show that as a result of the state action complained of 'a right or status previously recognized by state law was distinctly altered or extinguished.' Id. at 711. The Court explained:
 
 
 14
 But the interest in reputation alone which respondent seeks to vindicate in this action in federal court is quite different from the 'liberty' or 'property' recognized in those decisions. Kentucky law does not extend to respondent any legal guarantee of present enjoyment of reputation which has been altered as a result of petitioner's actions. Rather, his interest and reputation is simply one of a number which the state may protect against injury by virtue of its tort law, providing a forum for vindication of those interests by means of damage actions. And any harm or injury to that interest, even where as here inflicted by an officer of the state, does not result in a deprivation of any 'liberty' or 'property' recognized by state or federal law, nor has it worked any change of respondent's status as theretofore recognized under the State's laws. . . . That being the case, petitioners' defamatory publications, however seriously they may have harmed respondent's reputation, did not deprive him of any 'liberty' or 'property' interests protected by the Due Process Clause.
 
 
 15
 424 U.S. at 711-712, 96 S.Ct. at 1165 (emphasis added). Accord Sullivan v. Brown, 544 F.2d 279, 283-84 (6th Cir. 1976).
 
 
 16
 In the present case, Martin has failed to establish anything more than alleged damage to his reputation. Although Martin was at one time 'discharged' from his employment with the Charlevoix Police Department, he successfully appealed that discharge. His status as a police officer was therefore unaffected by the allegedly stigmatizing charges. In a similar case, the Seventh Circuit made the following remarks with respect to a suspended police officer's claim of a liberty deprivation:
 
 
 17
 It is true . . . that a police officer who is suspended, however briefly, on the ground of unprofessional conduct has a black mark against him that may impede his advancement and reduce his chances of finding a good job elsewhere. But if that were a basis for claiming damages for a deprivation of liberty, every reprimand that became part of a public employee's file would be a potential basis for a section 1983 case, and the federal courts would become the grievance machinery for public-sector employees.
 
 
 18
 Hershinow v. Bonamarte, 735 F.2d 264, 266 (7th Cir. 1984).
 
 
 19
 The district court judgment dismissing plaintiffs' claims is affirmed.
 
 
 
 *
 Honorable Anna Diggs-Taylor, United States District Court, Eastern District of Michigan, sitting by designation
 
 
 [1]
 Plaintiff's original complaint relied on several statutory and constitutional sections for its jurisdictional basis but only his Sec. 1983 claims are involved in this appeal
 
 
 [2]
 District Court Findings of Fact and Conclusions of Law (App. 25)