[No. D004864. Fourth Dist., Div. One. July 9, 1987.]

MARY ALICE HILL, Plaintiff and Appellant, v.
CALIFORNIA STATE UNIVERSITY, SAN DIEGO et al.,
Defendants and Respondents.

**COUNSEL**

Ashcraft & Doyle and Christopher L. Ashcraft for Plaintiff and Appellant.

John K. Van de Kamp, Attorney General, and Melvin R. Segal, Deputy Attorney General, for Defendants and Respondents.

**OPINION**

**BUTLER, J.**—President Thomas B. Day appointed Mary Alice Hill Director of Intercollegiate Athletics at San Diego State University on January 1, 1984. Day terminated Hill's employment August 22, 1985. The court denied Hill's petition for a writ of mandate for reinstatement, back pay, a liberty hearing and attorney fees. She appeals. We shall conclude Hill served at the pleasure of the president, was not a permanent employee of the university and is not entitled to reinstatement, back pay, attorney fees, or a liberty hearing.

I

The university first hired Hill as associate director of athletics, women's programs, for the academic year 1976-1977. Her appointment letter included this paragraph: "Tenure is not granted in the coaching categories. Each yearly contract is temporary; it may be renewed, given good service, but no promise of renewal is implicit in any year's appointment. If you are reappointed, you will be expected to have completed your doctorate by June 1, 1979. This position is a 12-month position which includes 21 days of vacation during the year but requires your services during the various academic recesses when faculty do not normally work. Your salary for 1976-77 will be $20,736, unless the State Legislature passes and the Governor approves a pay increase." Hill accepted the position and signed the letter. June 15, 1977, she accepted a 12-month appointment as a coach for the year commencing July 1, 1977, and signed a statement of terms and conditions of

employment including: "Appointments as Director of Athletics or any coaching category are made for specific periods of no more than one year; though appointments may be renewed at the pleasure of the University, tenure is not earned in these classes. Reappointment and promotion are based upon full consideration of the education, experience, expertise, and successful previous service of each individual." For the academic years 1978, 1979, 1980, 1981, 1982 and 1983, Hill was appointed to coaching and other positions in the athletic department. Each appointment was for a 12-month period. In 1979, the university appointed her associate director of athletics. The appointment letter cautioned the position was on a "year-to-year" basis and "[t]enure is not granted in this position." Like appointment letters with similar statements were accepted by Hill in 1980, 1981, 1982 and 1983. July 28, 1983, the university appointed her acting athletic director effective August 15, 1983, for one year. On December 31, 1983, the university by letter informed Hill: "[Y]ou are designated Administrator III, with San Diego State University title of Director of Intercollegiate Athletics, and your annual salary rate will be approximately $50,000 effective January 1, 1984. This includes all mandatory and discretionary base salary adjustments anticipated for the remainder of this fiscal year. Minor adjustment may result as we move to a yet-undesignated System grid of management salary levels.

"This decision has been made under the presidential authority of the Management Personnel Plan adopted by the Board of Trustees of the California State University, effective January 1, 1984, and the SDSU Merit Evaluation Procedures I have issued in support of the Board's action. You should be familiar with the Board's policy and the campus procedures in these documents, and any subsequent amendments. In particular, all future salary adjustments and assignments of responsibilities will be at the pleasure of the President." The director of athletics, under the president's supervision, is responsible for planning, directing and coordinating a comprehensive intercollegiate athletic program at the university.

July 24, 1985, President Day learned Hill, without authority so to do, had attempted to fire several members of her staff. Day rescinded these attempted terminations. Discussions followed. Day placed Hill on sick leave and arranged for a psychiatric examination. Hill refused to report for the exam. She was examined by her own doctor. Newspaper and other media accounts of the controversy flourished. Following an investigation, the staff members terminated by Hill were cleared of any wrongdoing. Day lost confidence in Hill and on August 8, 1985, removed her from sick leave, reassigned her to the position of assistant to the president and gave her the required 90-day notice of termination of employment effective November 8, 1985. At Hill's request, Day reconsidered and then reaffirmed his decision.

Her petition for a writ of mandate for reinstatement, back pay and a liberty hearing was denied. She appeals. We affirm.

## II

 Hill's appointment was made by the president under the authority of the management personnel plan provided for in title 5, California Administrative Code, article 2.2, sections 42720–42728.[1]

Section 42723, subdivision (a), provides: "A Management Personnel Plan employee serves at the pleasure of the campus President or the Chancellor, as appropriate. A Management Personnel Plan employee shall not serve a probationary period and shall not receive permanent status."

Hill concedes her service as director was at the pleasure of the president because of her appointment under the management personnel plan but for documents retrieved by her from her personnel file and notations on a pay form used by the university. She contends these papers demonstrate the university conferred permanent status upon her. Section 42723, subdivision (b), cited by Hill to support her position, says a management personnel plan employee who had permanent status in a class prior to January 1, 1984, retains permanent status in that class despite later inclusion as a management personnel plan employee. As we have seen, Hill did not have permanent status in any class when appointed director of athletics. Under section 42723, subdivision (c), a management plan personnel employee who had attained earlier permanent status retains retreat rights to the former class in which permanent status is held. Hill does not contend she has retreat rights and could not successfully so assert as she concedes she did not have earlier permanent status. Hill seems to be saying section 42723, subdivision (b), authorizes the president to confer permanent status upon her. The documents claimed to support such are included in Hill's petition as Exhibit "K." Exhibit "K" is entitled "CSU PERSONNEL/PAYROLL TRANSACTION," FORM 456, and the bottom section is captioned "CSUC Employee Record" and is referred to as a roster card. The roster card shows the effective dates of Hill's various assignments, the positions filled, salary and employment history remarks in the last column. The top three entries on the roster card show her "Class Title and Range" as "Admin. III A," the management personnel plan designation in which she was approved. The top entry under employment history remarks shows "Perm. Appt" with an effective date "07/01/84" and the Admin III. A title and range. Attached to the university's response to the petition is a declaration by

---

[1] All section references are to the California Administrative Code unless otherwise specified.

Georgia Soisson, a university administrator responsible for payroll reporting. Soisson explains the form: "The bottom section of Form 456 is captioned 'CSUC Employee Record,' and is commonly referred to as a roster card. Mary Alice Hill's roster card (Petitioner's Exhibit K) shows an entry dated 07/01/84 and labeled 'Perm. Appt'; this caption is computer generated from the A50 transaction entry on Form 456 (Permanent Appointment, Current Employee). This item is used to reflect the computer's recognition that the duration of an employee on the payroll system does not include an automatic cut off date. At present, processing options are limited. They are shown on Exhibit 1 to this Declaration; Exhibit 1 is from the State University Personnel Information Management System (PIMS) Manual. The payroll 'permanent appointment' is an ongoing appointment for which the computer is not given an automatic termination date. This payroll category is used for probationary, tenure and 'at will' employees, including both executives such as Presidents and Management Personnel Plan employees, such as Mary Alice Hill. In the jargon of the computerized payroll, a 'permanent appointment' is one without a specified cut off date. It does not mean that the appointment confers any right to permanent employment with the appointing power." The top half of form 456 includes employee data. Hill points to box 430 as further proof of permanent status. Soisson explains this entry: "Form 456 handles recordation of rights to permanent employment in Item 430, 'Probationary Period.' Exhibit 2 to this Declaration, also from the PIMS Manual, shows that Item 430 will always be coded in with the A50 transaction ('Required').

"Mary Alice Hill's Item 430 is coded as 'N.' The legend for Item 430, (Exhibit 2), shows that 'N' stands for no probationary or permanent status. If Mary Alice Hill were given permanent status, the proper coding for her Form 456, Item 430 would be 'I' which, as the legend in Exhibit 2 states, signifies 'Permanent/Tenured' status. As shown on Exhibit 2, there are also codings for various probationary and other statuses.

"The Form 456, of course, would not be the document which conveys either probationary or permanent status. Appointment documents are handled by appointment letters, evaluation forms, and similar personnel letters and forms. The probationary and permanent employment is given by appointing powers (always, in my experience, by letter), and not by computer generated transaction forms."

We conclude form 456 does not confer permanent status to Hill.[2] Her appointment was under the management personnel plan. Form 456 reflects

---

[2] Hill concedes form 456 was included within documents requested by her after termination. She makes no contention of reliance on the form before or during her employment as director.

such appointment. That plan does not confer permanent status (§ 42723, subd. (a)). Form 456 records clerical matters. It does not constitute an appointment. Hill served at the pleasure of the president.

In *Barthuli* v. *Board of Trustees* (1977) 19 Cal.3d 717 [139 Cal.Rptr. 627, 566 P.2d 261], an associate superintendent sought a writ of mandate to compel his reinstatement after the board had voted to rescind his contract. Barthuli claimed his constitutional rights had been violated because, prior to the termination, he was not given notice, specification of reasons, or an opportunity to respond. He contended he had an expectation of continued employment and his summary dismissal denied him due process. ■ The Supreme Court pointed out: "In *Skelly* [v. *State Personnel Bd.* (1975) 15 Cal.3d 194 [124 Cal.Rptr. 14, 539 P.2d 774]] we held that a *permanent civil service* employee is entitled to 'notice of the proposed action, the reasons therefor, a copy of the charges and materials upon which the action is based, and the right to respond, either orally or in writing, to the authority initially imposing discipline.' (*Id.,* at p. 215.) This holding is predicated on the finding that permanent civil service employees possess a property right in continued employment because they cannot, under statutory law, be disciplined without cause. (*Id.,* at p. 207.)" (*Barthuli, supra,* at p. 722, their italics.) The court stressed that to have a property interest in employment the individual must have more than a unilateral expectation of it and that it must be based upon state law. (*Ibid.*)

The court concluded that in his position as an administrator Barthuli did not have a property right in his position and the procedural rights recognized in *Skelly* were inapplicable. (*Id.* at pp. 722-723.)

■ While *Skelly* requires procedural processes for discharge of permanent employees, at-will employees are not so entitled. Hill was not entitled to *Skelly* procedures. (*Lubey* v. *City and County of San Francisco* (1979) 98 Cal.App.3d 340 [159 Cal.Rptr. 440].)

### III

■ Citing *Ofsevit* v. *Trustees of Cal. State University & Colleges* (1978) 21 Cal.3d 763, 775 [148 Cal.Rptr. 1, 582 P.2d 88], Hill goes on to assert entitlement to reinstatement "and/or" a full evidentiary hearing because "the allegations upon which she was discharged" impact her First Amendment rights. ■ "Thus we have held that a dismissed public employee is entitled to a judicial determination of the true reason for his dismissal when he seeks to show that he was dismissed because of his exercise of constitutional rights. In reviewing such a dismissal the trial court not only examines the administrative record for errors of law, but also exercises its indepen-

dent judgment upon the evidence disclosed. [Citation.] Once the trial court has resolved the constitutional issue by an independent assessment of the factual elements, the appellate court reviews the record to determine whether the trial court's findings find support in substantial evidence in light of the entire record. [Citations.]" (*Ofsevit, supra,* at p. 773, fn. omitted.) ▇ A temporary employee who has no reasonable expectation of continued employment and may be discharged without any statement of reason, may claim reinstatement if the decision not to rehire was made because of exercise of First Amendment freedom (*Ofsevit, supra,* at p. 775). ▇ Here, the trial court specifically found the university did not violate Hill's First Amendment rights. Substantial evidence supports that finding.

Hill's services were terminated because Day lost confidence in her ability to perform as director of athletics. Her discharge had nothing to do with the exercise of her right to speech.

In July 1985, Hill fired long-term employees without authority and without affording those employees *any* procedural protections. Additional employees were discovered to have been fired on July 26, 1985. The terminations were rescinded. Day had warned Hill not to remove employees. He was concerned about her actions. Hill tried to convince Day of employee wrongdoing. His investigation failed to turn up evidence to support her charges. Hill said she did not trust Day's vice presidents, nor the director of personnel services, people with whom she had to work.

Day based Hill's termination, not on her exercise of speech, but on her actions in firing university employees, her inability to work with his senior officials, her unfounded belief that Day agreed to raise her salary and her unsubstantiated belief that her office was bugged and meetings tape-recorded.

Day's statements contradict Hill's speculation that her contacts with the press or her exercise of speech formed the basis of her termination. The trial court resolved any conflicts in the evidence, and those were resolved in the university's favor.

Hill invited the disclosure of specific reasons for her discharge because she sought them out. Initially, her termination was based on the president's "lost confidence in [her] performance of the duties of Athletic Director." Hill then requested the reasons which led to her separation. Day responded, and noted he had "not publicly detailed the items referred to here. I have limited my public comments to the minimum possible in a difficult situation, where the press and community have made great demands. My con-

cern for you has limited my public statements. I do not want to injure your prospects of securing employment elsewhere."

The reasons for Hill's separation were not released by the president. At her request, her absence was characterized as vacation.

The record is void of any adverse publicity generated by the university, whose communications were treated as confidential. *Bishop* v. *Wood* (1976) 426 U.S. 341, 348 [48 L.Ed.2d 684, 692, 96 S.Ct. 2074], pointed out publicity engendered following institution of litigation cannot constitute support for an earlier arising claim.

## IV

 Finally, Hill asserts her right to a liberty hearing. In *Phillips* v. *Civil Service Com.* (1987) 192 Cal.App.3d 996 [237 Cal.Rptr. 751], we noted probationary employees of public agencies may be dismissed without a hearing and without judicially cognizable good cause. Here, Hill served at the pleasure of the president. We quoted an exception to this rule as stated in *Lubey* v. *City and County of San Francisco, supra,* 98 Cal.App.3d 340 at p. 346: "But there is an important exception to this rule, which is founded upon the Fourteenth Amendment. It arises where there is a deprival of the 'liberty' guaranteed all persons by that amendment's due process clause. The exception will be applied where the probationary employee's job termination, or dismissal, is based on charges of misconduct which 'stigmatize' his reputation, or 'seriously impair' his opportunity to earn a living (*Paul* v. *Davis,* 424 U.S. 693, 702 . . .), or which 'might seriously damage his standing or associations in his community' (*Board of Regents* v. *Roth* . . . 408 U.S. 564, 573 . . . and to the same effect see *McNeill* v. *Butz* [(4th Cir. 1973)] [480] F.2d 314, 319; *Daniel* v. *Porter* [(W.D.N.C. 1975)] 391 F.Supp. 1006, 1010.)

"Where there is such a deprival of a 'liberty interest' the employee's 'remedy mandated by the Due Process Clause of the Fourteenth Amendment is "an opportunity to refute the charge" [and] "to clear his name." ' (*Codd* v. *Velger* [1977] 429 U.S. 624, 627 . . . .) He must be afforded ' " 'notice and opportunity for hearing appropriate to the nature of the case' *before* the termination becomes effective." ' (*Board of Regents* v. *Roth, supra,* 408 U.S. 564, 570, fn. 7 . . . .)" (*Lubey* v. *City and County of San Francisco,* supra, 98 Cal.App.3d 340 at p. 346, fns. omitted, brackets and italics theirs.)

*Board of Regents* v. *Roth* (1972) 408 U.S. 564, 573 [33 L.Ed.2d 548, 558, 92 S.Ct. 2701], notes a liberty hearing may be required where a public

employee's " 'good name, reputation, honor or integrity' " is at stake and a stigma or other disability forecloses freedom to take advantage of other employment opportunities. *Paul* v. *Davis* (1976) 424 U.S. 693, 709 [47 L.Ed.2d 405, 418, 96 S.Ct. 1155], held defamatory statements made by police officers did not deprive a defamed person of any Fourteenth Amendment liberty or property interests and denied a claim for relief under the Civil Rights Act ( 42 U.S.C. § 1983). In *Codd* v. *Velger* (1977) 429 U.S. 624 [51 L.Ed.2d 92, 97 S.Ct. 882], a probationary police officer terminated for an apparent suicide attempt was denied relief for failure to challenge the truth of the allegation.

■ Hill urges two bases to support her liberty hearing claim.

## A.

Day discussed with Hill on July 25, 1985, various matters concerning (1) her terminating without authority the employment of members of the university's athletic staff, (2) Hill's hiring a private investigator to look into athletic department problems, (3) Hill's explanation her failure to return telephone calls was due to destruction by her secretary of telephone messages, and (4) Hill's observation if she was terminated, Day could be replaced by the campus vice president for student affairs. Day told Hill to take two weeks' sick leave and to undergo a medical and psychiatric examination. Initially agreeing so to do, Hill declined and did not take the examinations. Hill asserts the request to take a psychiatric exam stigmatized her and she is entitled to a hearing to clear her name, citing *Stewart* v. *Pearce* (9th Cir. 1973) 484 F.2d 1031. Stewart was employed under contract for an academic year as an English instructor at San Mateo College. He participated in campus anti-Vietnam war protest activities, one of which disparaged the college. Because of these activities, he was ordered to undergo a psychiatric examination to determine his mental competency to perform his duties. Stewart refused. He was reassigned library duties, his grievance was sustained by the faculty senate, the college nevertheless continued the library assignment and Stewart stopped reporting for work. The college dropped the mental incompetency proceeding and sought to dismiss him. He sued for an injunction and damages under the Civil Rights Act. The court affirmed a preliminary injunction requiring reinstatement and a hearing concerning the psychiatric order and removal from the classroom. The court noted Education Code section 13411, denying suspension for incompetency due to mental disability until a psychiatric report of incompetency has been received, was amended in 1973 to provide a written statement of facts and a hearing to explain or refute charges of mental incompetency. (*Id.* at p. 1033, fn. 3.) While the decision characterizes the order for the psychiatric exam created a "stigma, an official branding" (at p. 1034), such

as to compel a liberty hearing, *Stewart* does not require a liberty hearing be granted Hill because Day's direction to take sick leave and undergo a medical and psychiatric exam was not ordered under Education Code section 13411 which was reenacted effective in 1977 as Education Code section 44942 and included under chapter 4 concerning certificated employees. Hill is not a certificated employee. Section 43404 of the California Administrative Code provides a management personnel plan employee may be required to submit to a medical examination to determine whether the employee is disabled from performing duties of the position. Failure or refusal to submit to the medical examination does not prevent the appointing power from submitting an application for disability retirement or from conmencing disciplinary action.

Here, none of these things occurred. Hill agreed to take the examination, then refused to follow through. Day did not seek her retirement for disability or initiate disciplinary action. As we have seen, Day terminated Hill because he lost confidence in her. In *Stewart,* mental disability proceedings had commenced and were later dropped. While a stigma may attach upon the commencement of such statutory proceedings, here the suggestion was made and Hill eventually declined. The trial court correctly concluded a liberty hearing was not required as to the examination issue.

## B.

Hill claims a liberty hearing is required to clear her name of allegations made in the course of the termination process, arguing the "accumulated" impact of these allegations stigmatized her. Hill catalogues various incidents in her declaration attached to her replication. She investigated allegations she was not responding to correspondence or answering telephone calls. In off hours, she went through correspondence and discovered signed letters had not been mailed, expense vouchers had not been processed, documents were missing from files, a subordinate employee was auditing department expenses because of a paperwork backlog, and her signature to documents was forged by her employees. She fired Gabe Ortiz because of these discoveries. She fired Steve Cushman because of ticket transactions. She terminated the contract of a public relations adviser for failure to get television coverage. Her secretary sought and received a transfer to another department. All of the events occurred the same day, July 24, 1985. Hill also asked for letters terminating the employment of the secretaries of the fired employees.

Hill mentioned these matters while meeting with Day July 25, 1985, and showed him documents. Day told Hill her charges suggested his vice presidents were not doing their jobs and thus he was derelict in his duties. Hill

passed on a rumor one of the vice presidents wanted Day's job. Hill presented documents evidencing her claims of forgery, misappropriation of funds and fraud. Hill delivered documents to Vice President Erikson related to the discoveries she made. She did not participate in Erikson's activities. Hill participated in several meetings with Day, university counsel and her lawyers present. At these meetings, matters noted above were rehashed. At the reconsideration meeting, Hill mentioned she had seen copies of a sexual harassment complaint included in documents she had demanded the university produce. Day told Hill he had not informed her of the complaints or any specifics of the complaints. Day's declaration states Hill's termination was not based on the sexual harassment complaint.

Hill's termination came about because of her conduct in firing, without authority so to do, long-term university employees, in terminating a contract for public relations services and in other matters referred to above. Hill asked for and received a box of documents in the course of the termination proceedings. She learned then for the first time of the sexual harassment complaint. Substantial evidence supports the trial court's conclusion the utterances made and the documents adduced in the course of Hill's termination proceedings did not stigmatize her. The liberty hearing was properly denied.

Judgment affirmed.

Kremer, P. J., and Work, J., concurred.