OPINION OF THE COURT
William R. LaMaeca, J.
The court, sua sponte, recalls its order of October 20, 2008 to correct a typographical error in the caption and substitutes the following order in its place, nunc pro tunc:
Requested Relief
Petitioner, Alexandra Bursae, moves for an order, pursuant to CPLR article 78, to review the action of the respondent, Nassau County Executive Thomas R. Suozzi (hereinafter referred to as the County Executive), in the placing of petitioner’s name and picture and identifying information on the respondent’s Internet Web site described in press releases as the “Wall of Shame” and for a permanent injunction enjoining and restraining the County Executive and his agents from posting said name, picture and identifying information on said Web site and directing the removal of same. Oral argument with respect to petitioner’s request for a preliminary injunction was heard on October 6, 2008, at which time the court declined to grant the requested relief pending determination of the petition, preferring to maintain the status quo until the legal issues raised herein were thoroughly researched. Counsel for the County Executive opposes the petition, which is determined as follows:
Background
In this case of first impression, the question presented is whether the County Executive exceeded his authority or breached some constitutional protection in posting petitioner’s name, “mug shot” picture and identifying information on an Internet Web site regularly maintained by the County Executive for publication of newsworthy press releases. Some of the press releases announced new driving while intoxicated (DWI) arrests in the County, which the County Executive described as the *330 “Wall of Shame,” for the announced purpose of publicizing the names and arrest pictures of “those who break the law by driving drunk” and to “make sure their friends, neighbors and families know about it” (press release, exhibit B to the moving papers). Counsel for petitioner states that, on or about May 30, 2008, in his official capacity, the County Executive, together with Police Commissioner Mulvey, created the “Wall of Shame” and, thereafter, held numerous press conferences to publicize the “scarlet letter” campaign (press release, exhibit A and Newsday.com, exhibit E to the moving papers), and sent the names and photographs of those accused of drunk driving and related offenses to various media outlets which were encouraged to post said information to insure that the “shaming” was public and widespread (affirmation of petitioner’s attorney).
On or about June 10, 2008, petitioner, with no prior arrests or convictions, was arrested and charged by the Nassau County Police Department and the Nassau County District Attorney’s Office with a violation of Vehicle and Traffic Law § 1192 (2) (driving while intoxicated, hereinafter referred to as DWI) and § 1192 (4) (driving while ability impaired by drugs, hereinafter referred to as DUI). The allegations are that petitioner was operating a motor vehicle with a .09 blood alcohol level (.08 is the legal limit) as well as operating a motor vehicle while under the influence of drugs. Counsel for petitioner points out that, on August 1, 2008, the DUI drug charge was dismissed as the urine test for drugs was negative, and that, to date, a plea of not guilty has been entered but there has been no disposition or conviction on the remaining DWI count in the Nassau County District Court.
One week after petitioner’s arrest, on or about June 17, 2008, the County Executive, in his official capacity, posted the name and arrest picture of petitioner on the County Web site, embedded in a press release. By letter, dated September 22, 2008, petitioner demanded that the County Executive remove her name and picture from the “Wall of Shame.” Counsel for petitioner states that the request has not been complied with and incorrectly asserts that the County Executive continues to re-post petitioner’s name and picture on the Web site as new names are added to the “Wall of Shame.” In actuality, the County maintains only the original press release of petitioner’s name on its Web site, by date of publication, containing her name, picture and identifying information. The “Wall of Shame” campaign has garnered national press coverage and has become *331 embedded in Internet search engines and press Web sites. It is petitioner’s position that the posting of her name and picture onto the “Wall of Shame” has caused, and continues to cause, great damage to the petitioner in that she has suffered public humiliation, great embarrassment, the potential loss of employment, unwarranted telephone calls and e-mails as well as the potential for a multitude of future harm — all without a prior finding of guilt. Counsel for petitioner argues that the “Wall of Shame” is a form of punishment that is beyond the authority of the County Executive to impose, citing People v Letterlough (86 NY2d 259 [1995]) and, moreover, violates the United States and New York State Constitutions by depriving petitioner of due process and the equal protection of the law and amounts to cruel and unusual punishment. Counsel for petitioner asserts that petitioner is entitled to the “presumption of innocence” and that the “Wall of Shame” is in violation of lawful procedure, is arbitrary and capricious, is an abuse of discretion and that petitioner has been deprived of a hearing and procedural due process.
In opposition to the motion, counsel for the County Executive essentially states that the petition should be dismissed because the information that is being posted in the Internet press releases about petitioner’s arrest is a matter of public record which can be accessed by the public, including the news media, through the Freedom of Information Law (FOIL). Counsel for the County Executive argues that there is no constitutional liberty or property interest to which due process attaches that can be found in the publication of a public record on a Web site; nor does an individual’s interest in his or her reputation, standing alone, constitute “liberty” or “property” under the Due Process Clause of the United States or New York State Constitution, citing Paul v Davis (424 US 693 [1976]). Counsel for the County Executive asserts that petitioner has not alleged that she sustained specific damages attributable to the dissemination of public information, nor can she prevail on her claims that the removal of individuals from the “Wall of Shame” who are under the age of 18 or the failure to include other individuals arrested for crimes other than DWI deprives her of equal protection under the law. Counsel for respondent contends that there is a rational basis for granting youthful offender status to 16-to-18-year-old arrestees (CPL 720.10), as well as a rational basis for publicizing the names and pictures of those arrested for DWI, which has the goal of deterring others from drinking *332 and driving. It is the County Executive’s position that the County’s DWI publication policy has a legitimate and important purpose and that petitioner cannot rebut its rationality and, therefore, the policy does not violate the Equal Protection Clause of the Constitution. Counsel for the County Executive points out that the posted information is correct and, in the interests of public health and safety, the County Executive’s “Wall of Shame” is a reasonable measure to deter those who would operate a motor vehicle while under the effects of drugs or alcohol.
The rationale for the “Wall of Shame” is set forth in the affidavit of Robert Hayden Esq., an Assistant District Attorney and Deputy Chief of the Vehicle Crimes Bureau in the District Attorney’s Office, who states that the County has committed enormous resources to deal with the deadly problem of driving while under the influence of alcohol or drugs and recognizes the need for preventive tools to address the problem before there is a need for criminal prosecution. Mr. Hayden states that his office supports the initiatives of the County Executive aimed at increasing awareness as to the dangers and penalties for driving drunk which he believes acts as a deterrence to these types of crimes. However, the issue of whether the actions complained of have a deterrent effect on citizens who would otherwise be inclined to drive while under the influence of drugs or alcohol is not before the court. In this court’s view, the issue is whether the County Executive has the authority to act in the manner set forth above and whether the petitioner has a valid constitutional argument.
The Law
The court has considered the following legal issues in resolving the matter before it:
Article 78 Proceedings
“Article 78 of the CPLR provides an expeditious and essentially uniform procedure for judicial review of matters that were cognizable at common law under the prerogative writs of certiorari, mandamus and prohibition. For the most part, Article 78 proceedings are used to challenge action (or inaction) by agencies and officers of the state and local government. . .
“It bears emphasizing, however, that although Article 78 ‘abolished’ the writs of certiorari, manda *333 mus and. prohibition, the new Article [created in 1937 as part of the Civil Practice Act] did not alter the substantive law on which they were based. . .
“[T]he availability of a remedy under Article 78 is still dependant upon a showing by the petitioner that he or she has a right to relief under the substantive law of certiorari, mandamus or prohibition. See, Newbrand v. Yonkers, 1941, 285 N.Y. 164, 33 N.E. 75. It is therefore common for courts and litigants to denominate a particular Article 78 proceeding as one which is ‘in the nature of certiorari, mandamus or prohibition, as the case may be.” (Vincent Alexander, Practice Commentaries, McKinney’s Cons Laws of NY, Book 7B, CPLR C780L1, at 27-29.)
The instant article 78 proceeding is in the nature of mandamus to review. “Mandamus to review is the modern name for judicial review of ‘administrative’ determinations involving the exercise of discretion.” (Vincent Alexander, Practice Commentaries, McKinney’s Cons Laws of NY, Book 7B, CPLR C780L3, at 36.) While certiorari is the form of review of a “judicial or quasi judicial” determination after a legally required trial type hearing, when a determination is “administrative” and involves a judgment or discretion made in the absence of such a hearing, mandamus to review is appropriate. (Id., CPLR C7801:2, at 31.) The standard of review in the instant proceeding is whether the determination was arbitrary and capricious or affected by an error of law as opposed to the “substantial evidence” standard required in certiorari proceedings. (Id.)
In the instant proceeding which seeks review of the County Executive’s determination to publish petitioner’s name, picture and identifying information on the “Wall of Shame,” counsel for the County Executive interposes two affirmative defenses alleging that the petition does not set forth a viable cause of action under CPLR article 78 as there has been no determination regarding the petitioner that could be deemed arbitrary and capricious as the actions complained of are only “ministerial” in nature. (Respondent’s verified answer.) As set forth in CPLR 7803, the only questions that may be raised in a CPLR article 78 proceeding are, in pertinent part,
“2. whether the body or officer proceeded, is proceeding or is about to proceed without or in excess of jurisdiction; or
“3. whether a determination was made in violation *334 of lawful procedure, was affected by an error of law, or was arbitrary and capricious or an abuse of discretion as to the measure or mode of penalty or discipline imposed.”
Herein, the petitioner asserts that the County Executive’s actions have usurped to himself the jurisdictional authority to punish a person charged with a crime, that “shaming” a citizen is not an acceptable form of punishment, and that the County Executive, in this instance, has acted in an arbitrary and capricious manner. Counsel for petitioner claims that there is no other forum for seeking the requested relief. In this court’s view, the CPLR article 78 proceeding is a proper vehicle to review the claims of the petitioner and the actions of the County Executive on the substantive merits and, therefore, rejects the County Executive’s affirmative defenses. A citizen must have an avenue to test the action of the County Executive, which may have an impact on a constitutionally protected right.
Separation of Powers
“Free government consists of three departments, each with distinct and independent powers, designed to operate as a check upon those of the other two co-ordinate branches. The legislative department makes the laws, while the executive executes, and the judiciary construes and applies them. Each department is confined to its own functions, and can neither encroach upon nor be made subordinate to those of another without violating the fundamental principal of a republican form of government.” (.Matter of Davies, 168 NY 89, 101-102 [1901].)
Article II of the Nassau County Charter, entitled “EXECUTIVE,” sets forth the duties and responsibilities of the County Executive, which are broad and multifaceted and include the preparation of the annual budget, reporting on the financial and other transactions of the County and its many departments, administrating and supervising the offices and functions of the county government and the services provided to its citizens. The report of the County Executive on the financial and other transactions of the County is to be presented in person before a session of the County Legislature and, the County Executive may, from time to time refer other information to the County Legislature that he deems necessary. Moreover, the County Executive appoints, subject to confirmation by the County Legislature, the head of every department and office of the County and may remove said appointees upon appropriate due *335 process requirements. The County Executive may establish advisory committees as deemed necessary and desirable for the promotion of the public health, safety and welfare, economic development and for any other goal determined by the County Executive to be for a proper public purpose. (Nassau County Charter §§ 202, 203.)
There is no evidence before the court that the County Executive created the “Wall of Shame” pursuant to any county or state legislation. Rather, counsel argues that the actions of the County Executive have been taken in the interests of public health and safety and are reasonably related to the stated goals of deterring drunk driving and cannot be said to be arbitrary and capricious. The court notes that Nassau County is the only county in the state that employs this method of public disclosure. Petitioner asserts that the “Wall of Shame” is a punishment and that the County Executive has overstepped his jurisdiction and improperly assumed the power granted to the judiciary, that of punishment. The fact that the County Executive has embarked on a new, perhaps innovative, program is not determinative of the issues before the court and is given no weight in this determination. Moreover, the court acknowledges that driving while intoxicated is a serious offense with deadly consequences to many innocent people and that the County Executive’s campaign to deter drunk driving is a valid exercise of the Executive’s function. At issue is a specific aspect of the proper executive procedure.
Due Process
Both the United States and New York State Constitutions provide that no person shall be deprived of life, liberty or property without due process of law. (US Const Amend XIV; NY Const, art I, § 6.) Petitioner claims that, by posting her name and arrest photograph on the county Web site with other DWI arrestees without a hearing and before she has been convicted of a crime, the County Executive has violated her right to due process of law.
Opposing petitioner’s claim, counsel for the County Executive relies upon Paul v Davis (supra), in which the Supreme Court of the United States held that the publicizing of an individual’s arrest record prior to an adjudication of guilt and without a hearing does not violate due process. In Paul v Davis, in an effort to address a serious problem of shoplifting, the Police Chief of the Louisville, Kentucky Division of Police alerted local merchants of possible shoplifters who might be operating dur *336 ing the 1972 Christmas season by distributing fliers containing the names and photographs of persons who were arrested during the years 1971 and 1972 or who had been active in various criminal fields in high density shopping areas. At the time of the flier’s circulation, respondent was facing a charge of shoplifting and had not been convicted. Shortly after distribution of the flier, the charge was dismissed. In a suit against the Police Chief in federal court, Davis asserted that the circulation of the flier publicizing his arrest for shoplifting violated his right to due process, inhibited him from entering business establishments and seriously impaired his ability to find future employment. The petitioner’s motion to dismiss was granted by the District Court, but was reversed by the Court of Appeals. The U.S. Supreme Court granted certiorari and reversed the Court of Appeals. In rejecting the respondent’s due process claim, the Supreme Court noted that reputation alone does not implicate any “liberty” or “property” interest sufficient to invoke the procedural protection of the Due Process Clause, and that something more than simple defamation by the state official must be involved to establish a constitutional claim.
“The words ‘liberty’ and ‘property’ as used in the Fourteenth Amendment do not in terms single out reputation as a candidate for special protection over and above other interests that may be protected by state law. While we have in a number of our prior cases pointed out the frequently drastic effect of the ‘stigma’ which may result from defamation by the government in a variety of contexts, this line of cases does not establish the proposition that reputation alone, apart from some more tangible interests such as employment, is either ‘liberty’ or ‘property’ by itself sufficient to invoke the procedural protection of the Due Process Clause.” {Paul v Davis at 1160-1161.)
Paul v Davis (supra) and its progeny hold that, in order to constitute a harm of constitutional proportion, government conduct which has the effect of stigmatizing an individual must be coupled with additional governmental action which affects or alters an individual’s legal status — also known as “stigma plus.” (See Rolon v Henneman, 517 F3d 140 [2d Cir 2008] [claims for humiliation, embarrassment and emotional distress are better left to state defamation law]; Sadallah v City of Utica, 383 F3d 34 [2d Cir 2004] [in order to prevail on a “stigma plus” claim, a plaintiff must show, inter alla, a material, state imposed *337 alteration of the plaintiffs status or rights such as deprivation of property or termination of employment].)
The New York Court of Appeals has applied the “stigma plus” analysis to the Due Process Clause of the New York State Constitution in Matter of Lee TT. v Dowling and Matter of Joel P. v Bane (87 NY2d 699 [1996]), two unrelated CPLR article 78 proceedings in which petitioners sought to have their names expunged from the New York State Central Register of Child Abuse and Maltreatment which reports incidents of alleged child abuse. The State Legislature devised a procedure in which individuals could request to have their names expunged from the Register; however, if the report was supported by “some credible evidence” the individual’s name remained on the list.
Lee TT. was employed as a psychologist in the child care center of a state psychiatric center. After being listed in the Central Register, he was transferred out of his unit. While it was not clear to the Court that the transfer was the result of the listing, the Court found that petitioner’s future prospects of employment in his chosen field were “severely jeopardized” by his placement on the Central Register (87 NY2d at 709). Similarly, Joel E and Aracelis E were foster parents who had to be licensed by the State or an authorized foster care agency pursuant to Social Services Law §§ 376 and 377. They provided foster care under a contractual agreement and received compensation for their services under 18 NYCRR 427.2 and 427.6. As a result of their being listed on the Central Register, the foster children they cared for were removed from their home, they were foreclosed from being compensated for providing foster care, and they were stripped of a statutory preference given to foster parents who have cared for a child for a continuous period of 12 months or longer.
In beginning its due process analysis, the Court of Appeals, citing Paul v Davis (supra), found that there was no constitutional prohibition against the State maintaining a list of suspected abusers to assist in discharging its responsibilities to protect and care for the subjects of abuse or to enforce the penal laws.
“Moreover, such information may be disseminated to others under some circumstances: government agencies commonly share information for law enforcement and investigative purposes. The consequent damage to a subject’s good name resulting from inaccuracies is not a matter of constitutional *338 magnitude and must be addressed by the tort laws regulating defamation. Indeed the Supreme Court has held that the police can publish the fact that an individual has been arrested, even though the charges were subsequently dismissed, without violating the subject’s constitutional rights (see, Paul v Davis, supra). The stigma which results from the publication of such defamatory material is not constitutionally protected. A loss of liberty results only if some more ‘tangible’ interest is affected or a legal right is altered ... In the commonly accepted phrase, there must be ‘stigma plus’ . . . The additional injury may be found in the loss of employment or the foreclosure of future employment opportunities.” (Lee TT. v Dowling at 708 [citations omitted].)
The Court of Appeals found that petitioners had a protected interest, and noted that petitioners succeeded on their due process claims only because they were able to demonstrate specific harm to their employment, not merely damage to their personal reputation. Moreover, while it found that the State had legitimate interests in maintaining the Central Register, it held that the standard to support the allegations against the subjects— “some credible evidence” — permitted a “bare minimum” of evidence and imposed no duty on the factfinder to weigh conflicting evidence, no matter how substantial (87 NY2d at 711). The Court of Appeals held that the danger of such a minimal standard of proof was evident, considering the subjective determinations of credibility in such reports and the high rate of false positive findings, and concluded that the Due Process Clause of the Federal Constitution required substantiation of child abuse reports by a fair preponderance of the evidence before release and dissemination of the Register to licensing agencies. The Court of Appeals directed that no report shall be released until a factfinder after a hearing determines that the report is substantiated by a fair preponderance of the evidence. The Court of Appeals determined that
“[d]ue process requires that a person whose constitutional rights are affected by government action is entitled to be heard and it makes obvious sense in most cases ‘to minimize substantially unfair or mistaken deprivations’ by insisting that the hearing be granted at a time when the deprivation can still be prevented . . . The deprivation of a constitutionally protected property interest may be remedied *339 post hoc by monetary damages but the injury inflicted on one’s reputation cannot be so easily overcome. The damage to the subject following publication of an unsubstantiated report of child abuse may be irreversible.” (Lee TT. v Dowling at 713.)
Therefore, this court concludes that publication of an arrest picture and identifying information is permissible under certain circumstances — except when the circumstances amount to “stigma plus.”
The Internet and Freedom of Information
Essentially, counsel for the County Executive claims that information posted on the “Wall of Shame” is a matter of public record which is being made “more public” by posting it on an Internet Web site, and he analogizes the posting to disclosure under FOIL. It cannot be disputed that an Internet Web site, which simultaneously publishes and broadcasts pictures and text locally and globally, with a click of the finger, is a technological phenomenon. Any person with a computer terminal, in any part of the world, can instantly access the Nassau County Web site and, with powerful search engines, type in any number of keyword entries, such as “shame,” “alcohol” and “arrest,” and be directed to the Nassau County Web site containing press releases and, therein, to petitioner’s picture and identifying information. Said information may be readily available to any prospective employer, casual acquaintance, potential landlord, creditor, Internet thief or predator. The petition relates that petitioner has received unwanted e-mails and phone calls from strangers on a frequent basis. The Internet has no sunset and postings on it will last and be available until some person purges the Web site, perhaps in decades to come.
The County Executive’s analogy of the public nature of the arrest records and the availability to the public of such information in requests under FOIL, overlooks that FOIL is designed to give guidance to the keeper of records on how to respond to a request for information and requires the government agency to balance the private interest against the public interest that would be served by disclosure of the personal information, before the information is provided. (Associated Press v United States Dept, of Justice, 2007 WL 737476, 2007 US Dist LEXIS 18443 [SD NY 2007].)
“The [United States] Supreme Court has adopted a broad construction of the privacy interests protected by FOIA Exemption 7 (C) [which applies to infor *340 motion compiled for law enforcement purposes]. In Reporters Committee, 489 U.S. at 762, the Court determined that ‘rap sheets,’ containing information on arrests, indictments, acquittals, convictions, and sentences of specific individuals were subject to privacy protection under FOIA Exemption 7 (C).” (Associated Press v United States Dept, of Justice, 2007 WL 737476, *4, 2007 US Dist LEXIS 18443, *12, citing Department of Justice v Reporters Comm, for Freedom of Press, 489 US 749 [1989].)
Moreover, FOIL requests may be denied when the person arrested is released and not prosecuted, as the records are sealed pursuant to CPL 160.50 (1) (c). (Matter of Leibowitz v Safir, 251 AD2d 581 [2d Dept 1998].) Indeed, in Matter of Investigation Tech., LLC v Horn (4 Misc 3d 1023[A], 2004 NY Slip Op 51010[U], *3 [Sup Ct, NY County 2004]), a Web site case where an enterprise wanted to gather information for publication on its Web site, the court upheld the denial of petitioner’s FOIL request for the birth dates of all Department of Correction detainees and found “that because petitioner’s Internet website allows for the virtual unrestricted and undetected gathering of personal data on an individual in violation of his personal privacy right, respondent’s determination denying dissemination of detainees’ birth dates cannot be said to be without basis in reason or arbitrary or capricious.”
Under FOIL, there is a broad standard of open disclosure by a government agency, except for the unwarranted invasion of a person’s privacy, or where release of information will deprive a person of a fair trial or impartial adjudication. (Public Officers Law § 87 [2] [g]; see also Matter of New York Times Co. v City of N.Y. Fire Dept., 195 Misc 2d 119 [Sup Ct, NY County 2003].) “What constitutes an unwarranted invasion of personal privacy is measured by what would be offensive and objectionable to a reasonable man of ordinary sensibilities.” (Matter of Dobranski v Houper, 154 AD2d 736, 737 [3d Dept 1989].)
None of these protections or avenues for review, as slight as they may be, are present when the government agency voluntarily promotes and publishes arrest records, containing names, pictures and identifying information, on an Internet Web site with unlimited access to the public, which may affect a legal status and impose specific harm by being available to, inter alla, search engines, credit agencies, landlords and potential employers, for a lifetime, regardless of the underlying outcome of the case. It is the scope and permanency of public disclosure on the *341 Internet by a governmental agency that distinguishes the County’s “Wall of Shame” from traditional and regular forms of reporting and publication such as print media. The County Executive’s campaign of publicizing DWI arrests serves a legitimate purpose but the use of specific identifying information on the Internet, with its endless implications, is of concern to the court.
With respect to petitioner’s contentions that the “Wall of Shame” violates the fundamental concept that all citizens charged with criminal offenses are afforded a “presumption of innocence,” the court notes that the lay sense of that term varies significantly from the legal meaning of the term as defined by the U.S. Supreme Court which has determined that the presumption of innocence is a standard that applies to evidentiary and trial issues rather than the privacy concerns as set forth herein. (See Taylor v Kentucky, 436 US 478 [1978]; Bell v Wolfish, 441 US 520 [1979]; cf. Matter of Wayne M., 121 Misc 2d 346 [Farn Ct, NY County 1983].)
In Taylor v Kentucky, the U.S. Supreme Court stated that
“[t]his Court has declared that one accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial. . . And it has long been recognized that an instruction on the presumption [of innocence] is one way of impressing upon the jury the importance of that right” (436 US at 485 [citations omitted]).
In Bell v Wolfish, the U.S. Supreme Court held that
“[t]he presumption of innocence is a doctrine that allocates the burden of proof in criminal trials; it also may serve as an admonishment to the jury to judge an accused’s guilt or innocence solely on the evidence adduced at trial and not on the basis of suspicions that may arise from the fact of his arrest, indictment, or custody, or from other matters not introduced as proof at trial . . . But it has no application to a determination of the rights of a pretrial detainee during confinement before his trial has even begun” (Bell v Wolfish, 44l US 520, 533 [1979]).
Therefore, the court rejects petitioner’s claim that publication of her arrest record violates her right to a “presumption of in *342 nocence.” Same will be charged to the trier of facts, but it has no applicability to arraignment or pretrial proceedings. (Bell v Wolfish, supra; Matter of Wayne M., supra.)
Finally, the court has considered petitioner’s assertions of a violation of her constitutional rights with respect to equal protection of the law and against cruel and unusual punishment, and find them to be without merit. However, the court notes that the “shaming” of a citizen as a sanction for DWI has been found by the Court of Appeals to be an inappropriate punishment to be directed by a judge, even if to protect the public and for deterrent purposes. (People v Letterlough, supra.) In Letterlough, the issue presented was whether, as a condition of probation, a court may order the defendant to affix to the license plate of any vehicle he drives a fluorescent sign warning “CONVICTED DWI.” As the Court of Appeals made clear, the true design of the sign condition was not to advance defendant’s rehabilitation (the purpose of probation), but to punish the defendant and “ ‘warn the public’ of the threat presented by his presence behind the wheel.” (People v Letterlough, 86 NY2d at 266. ) The Letterlough Court found that the “public disclosure of a person’s crime, and the attendant humiliation and public disgrace, has historically been regarded strictly as a form of punishment” and concluded that the proposed condition required “legislative involvement because of the obvious need for Statewide uniformity and the kind of policy choices that only an elected Legislature can make.” (People v Letterlough at 266, 267. )
Conclusion
It is the judgment of the court that the County Executive’s actions, in publishing and maintaining the petitioner’s name, picture and identifying information embedded in a press release on the County’s Internet Web site, which results in limitless and eternal notoriety, without any controls, is sufficient to be the “plus” in the “stigma plus” due process analysis in the case at bar. The court finds that the petitioner’s due process rights have been violated.
It is therefore ordered and adjudged, that petitioner is granted a permanent injunction and the County Executive is directed to remove petitioner’s DWI arrest record from the press release maintained on the county Web site.
All further requested relief not specifically granted is denied.